**INTERSTATE GENERAL GOVERN-MENT CONTRACTORS, INC.,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–338C.

United States Court of Federal Claims.

March 16, 1998.

Howell Roger Riggs, Jr., Gulf Shores, AL, for plaintiff.

Agnes M. Brown, U.S. Department of Justice, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Jeanne E. Davidson, for defendant.

## OPINION

BRUGGINK, Judge.

This case involves a highly technical dispute about what was required in a series of contracts to furnish heating and air-conditioning systems in nine buildings at the U.S. Army Signal Center, Fort Gordon, Georgia. The parties' inability to agree on pure questions of contract interpretation created fact disputes and prompted a trial, which was conducted on Fort Gordon between November 3 and 8, 1997. For the reasons that follow, the court concludes that plaintiff is entitled to recover on a portion of the claims flowing out of those contracts and is not entitled to recover on others. The court defers ruling on damages pending the parties' effort to resolve that issue.

## BACKGROUND

Determining what happened during the administration of this contract and why it happened has not been easy. The real issues were not carefully developed prior to trial. The trial presentations added unnecessary confusion. There were substantial gaps in the trial record, which the court was able to remedy only partially by a review of the documents.

### A. HVAC and EMCS on Fort Gordon

There are over two hundred permanent structures at Fort Gordon. The climate in each of these structures is controlled by complicated heating, ventilation, and air-conditioning (HVAC) systems. Each building is tied to a base-wide energy monitoring and control system (EMCS), which links all the permanent buildings on Fort Gordon.[1] The EMCS on Fort Gordon is, and was in 1990, when the contracts at issue were let, maintained under the watchful eye of Mr. James Pavliscsak, the supervisory, mechanical, engineering technician and chief of EMCS operations and maintenance on Fort Gordon.[2] The controls for all the buildings on the EMCS converge at the master control room (MCR), located in a modest, one-story, temporary structure. Within the white clapboard walls of this building beats the pulsing, electronic heart of the EMCS: a mainframe computer that processes data and modulates

---

1. The EMCS, as described by defendant, is akin to a computer network, where individual air-handling units (AHUs) and data environments (DEs) in individual buildings within the system can be controlled and monitored from a central location.

2. The court and the parties had the opportunity to be escorted on a tour of a portion of the Fort Gordon EMCS by Mr. Pavliscsak. We were also shown portions of the newly installed HVAC systems in five of the nine buildings at issue.

the climate of almost every permanent structure on Fort Gordon. There, Mr. Pavliscsak and his highly efficient group of assistants tend to the needs and wants of the mainframe computer, which speaks to them through a bank of glowing computer screens. A mother alligator does not observe a more proprietary and merciless vigilance over her brood of hatchlings than Mr. Pavliscsak does over the EMCS and all its constituent components.

### 1. HVAC systems

Each building on Fort Gordon possesses some type of HVAC system. Each HVAC system in a building can consist of: (1) air-handling units (AHUs), which push air through the ventilation systems to the various environments being modulated;[3] (2) a data environment (DE), which provides the information about the climate in particular environments; and (3) a local-control system, which takes the data from the DE and controls the AHUs to maintain a preset climate. The DE consists of various input-output (I/O) points, which are either temperature, pressure, or other sensors or control devices.[4] These points provide information about everything from temperature to position of dampers, depending on the sophistication of the HVAC system in place.[5]

Local control can be achieved with varying degrees of complexity. The simplest system would be a thermostat[6] connected to a heating or cooling unit. This system would be controlled by electric means, where the unit is turned on or off depending on the relationship between the set temperature and the actual temperature in the room. A complex system could consist of a number of temperature sensors and AHUs controlled by electronic means that take into account information from many sensors and modulates the air flow and temperature using variable dampers. The more complex the control mechanism, the more data points it processes to control the environment. The most sophisticated type of local control is direct digital control (DDC), which processes multiple data points ·and controls variable dampers, hot- and chill-water pumps, and AHU fans.

### 2. Interfacing with the Fort Gordon EMCS

The numerous buildings on Fort Gordon are networked through the EMCS, which monitors and controls the DEs and the HVAC systems in each building. The purpose of the EMCS is to enable energy management on a base-wide level and facilitate maintenance of the HVAC systems with minimal manpower. To accomplish this task, each building's HVAC system must be connected to the EMCS in such a way as to enable monitoring of the environment and machinery. This connection involves two tasks: (1) physical connection of the data points to the EMCS; and (2) electronic recognition of these data points through the central computer in the MCR. There are essentially two methods of interfacing with the EMCS.

First, each building can be connected to the EMCS through field interface devices (FIDs) and multiple exchanger or multiplexer cards (MUXs).[7] This is known as a FID–MUX interface. In a FID–MUX interface, each data environment is connected through a MUX, which combines the numerous I/O points from the DE such that the signals can be routed through a single line to a FID.[8]

---

3. Climate control is attained by using a combination of the AHU fan and hot- and chill-water pumps, which help to either heat or cool the air being pushed by the AHU. These pumps are maintained in the basement of each building and were installed under the contracts at issue. These pumps are not the subject of dispute under these contracts.

4. Both the EMCS and the local controls can share common equipment such as valves and damper actuators.

5. These I/O points represent the most local level of the HVAC system and thus the EMCS.

6. As Mr. Jeffrey Wesley, vice-president of William J. Wesley Company, testified, a thermostat serves the function of both temperature sensor and controller.

7. FIDs and MUXs are products of the EMCS supplier; they are not custom-built items.

8. The MUX is akin to a speaker phone, which can process many different voices and transmit those voices through a single phone line. One MUX panel can consist of numerous MUX cards. These cards are also referred to here as UNI cards, MUX interface cards, and Infoscan cards.

The FID has some built-in computing capability, i.e., it is able to differentiate between various signals coming from the MUX, make choices about which signals go forward, and generally does low-level manipulation of these signals. This type of interface was typical of most buildings on Fort Gordon at the time the contracts were let.

The other type of interface is an interface through a DDC system. In this scenario, each AHU is controlled by a local DDC system. Each DDC system is then connected to the EMCS using a DDC–EMCS interface,[9] where the mainframe computer directly connects with the DDC. The DDC converts the electric signals from the various I/O points into data manipulable on a computer network. The primary advantage inherent in having the data in this computer-manipulable form is that it permits significantly greater sophistication in control of the constituent components. In this scenario, the interface exists at the AHU DDC. FIDs and MUXs are not necessary in this configuration because the DDC can combine signals and can be programmed to satisfy the function of a FID and MUX.

The majority of the buildings on Fort Gordon were already connected to the EMCS using the older FID–MUX architecture. At the time, there was a Department of Defense moratorium on using DDC for local control because of the numerous protocol problems between the proprietary DDC systems and the EMCS; the Army was concerned about a potential "Tower of Babel" resulting from interfacing the EMCS with a number of different DDC systems from different vendors.[10] The moratorium could be avoided only by specific authorization from the Department of Defense.

At the time the contracts at issue were let, there were three different DDC vendors: Andover, Johnson Controls, and Staefa. Although the evidence was conflicted and unclear, plaintiff's testimony was more persuasive that in 1990 there was only one *readily available* interface [11] that could have linked together a DDC system with the Fort Gordon EMCS: the DDC–Infoscan interface produced by Dorsetts.[12] Apparently Dorsetts made two types of Infoscan interfaces, one for use with the Johnson Controls DDC and one for use with the Staefa DDC. Because the interface was essentially a translator between two independent computer systems, the smaller DDC and the larger mainframe on EMCS, none of these interface items were "off the shelf" items.

## B. *The IGGC Contracts*

In 1990 the U.S. Army solicited bids for three projects involving the upgrade of the HVAC systems of nine different buildings on Fort Gordon. From September 1990 to January 1991, the Army awarded three separate, firm-fixed-price contracts to plaintiff Interstate General Government Contractors (IGGC), a general contractor for construction and renovation projects. The contract numbers, date of award, amount, and building numbers were as follows:

---

9. This interface is referred to by the parties and in this opinion as a DDC–Infoscan interface. Infoscan is the trade name for the EMCS on Fort Gordon, which was manufactured by Computer Sciences Corporation (CSC). Dorsetts later bought the part of CSC's business that covered EMCS.

10. The existence of this state of affairs was explained by plaintiff's witness, Mr. Jeffrey Wesley. The government was in the logical position to contradict this assertion, but it did not do so. Thus although there was only the contractor's testimony to prove the point, the court will assume that it is true. It is not an illogical assertion. If there were purchases of separate DDC systems on a single military base, it is easy to foresee, in the absence of a generally available interface that was not uniquely proprietary, why such a moratorium might be in place. Otherwise a great deal of money might be spent on state-of-the-art local controls that could not "speak" to each other or to the EMCS.

11. During trial, the DDC–Infoscan interface was repeatedly referred to as a "language protocol driver." In the interest of simplicity, it will be referred to in this opinion as either the "DDC–Infoscan interface" or merely as an "interface."

12. Defendant's witnesses, Mr. Richard Rusek and Mr. James Pavliscsak, testified that other manufacturers were willing to provide a DDC–Infoscan interface, but they were unable to name particular manufacturers or to testify as to whether these manufacturers would be able to provide connections to particular proprietary systems.

| Contract No. | Award Date | Amount | Buildings |
|---|---|---|---|
| DABT11–90–C–0042 (Contract 0042) | 9/24/90 | $886,200 | 29707 29716 29720 |
| DABT11–91–C–0014 (Contract 0014) | 1/11/91 | $419,349 | 29704 29709 29722 |
| DABT11–91–C–0018 (Contract 0018) | 1/15/91 | $428,955 | 29809 29810 29811 |

Contracts 0014 and 0018 required replacing existing heating equipment, air-conditioning equipment, and EMCS equipment and adding new EMCS points in six nonbarracks buildings. Contract 0042 required replacing existing heating equipment, air-conditioning equipment, and EMCS equipment in three barracks buildings, as well as adding EMCS points in the basement of building 29707.

When Fort Gordon decided to upgrade the HVAC systems in the nine buildings at issue, the bulk of the work was described in section 15A1 of the contract specifications. It was important, however, to ensure that the new systems were tied into the existing EMCS system. Therefore, Mr. Pavliscsak assisted in determining what was needed to connect the upgraded HVAC systems to the Fort Gordon EMCS. Accordingly, he developed what became section 13C1 of the contract specifications. As it developed, there evolved a certain limited overlap between the scope of coverage of sections 13C1 and 15A1.

Section 15A1, which described over ninety percent of the work under the contracts, obligated a contractor to install the equipment in such a way that it contained many points at which the system could be controlled and monitored, for example through temperature sensors, fans, and pump controls. These sensors and controls formed the DE. The controls called for by section 15A1 were "local"; they could be acted upon at each specific building location. These controls and sensors were required, in other words, independently of the need expressed in section 13C1 for connectivity to the EMCS. It would be theoretically possible to have purely local controls installed pursuant to section 15A1 on all the new equipment.

Like section 15A1, section 13C1 also assumed the existence of a DE consisting of dozens of I/O points within each building. Under this section, however, the DE had to be tied into the EMCS so that the HVAC in these buildings could be controlled from the MCR by Mr. Pavliscsak and his staff. In this sense, the I/O points were shared between the two sections. As the specifications were designed, all work related to the EMCS was defined in section 13C1 of the contract specifications and corresponding drawings.[13] For example, the scope of section 13C1 is described as "providing all plant, labor and materials for a complete functional Energy Management and Control System as specified herein and as indicated on the subcontract drawings." [14]

IGGC was the successful bidder on the three contracts. Therefore it had the obligation to install all the new HVAC equipment. It subcontracted, however, most of the section 13C1 EMCS work, as well as the overlapping portions of the section 15A1 local-control work to William J. Wesley Company (WJW), a company that provides building automation and controls equipment, including labor and equipment for EMCS and local controls. Although both IGGC and WJW incurred costs that comprise the claim, approximately half of IGGC's claim is a pass-through of costs incurred by WJW. The key witness for plaintiff was Mr. Wesley, the vice president of WJW and the person who prepared WJW's bid to IGGC and administered WJW's portion of the three contracts.

Pursuant to the subcontract, WJW was to provide portions of the automatic temperature-control system and sensors and equipment for energy management in accordance with the plans and specifications. Mr. Wesley did not inspect the buildings to be cov-

13. On Contract 0042, Plates E–3 and M–6 describe the EMCS requirements and the EMCS input-output table.

14. The specifications repeatedly refer to "subcontract" and "subcontractor." During trial, the parties noted that the specifications were culled from different specifications used by Pan Am, a contractor on another contract, and contained instructions for the subcontractor to Pan Am. The specifications were amended during solicitation.

ered under the contract until after the award of the contracts to IGGC. He did attend the preconstruction meeting, however, and, during the several months after Contract 0042 was awarded, Mr. Wesley made several site visits to Fort Gordon to inspect the existing EMCS system.

WJW submitted proposals to IGGC for each of the contracts to provide EMCS and local-control equipment. Wiring was to be installed by IGGC. After IGGC was awarded the contracts, WJW entered into purchase orders with IGGC based on WJW's proposals.[15] During trial, Mr. Wesley testified that, at the time the contracts were let, he intended to supply prebuilt panels based on pneumatic system interfacing with the existing MUX through a data terminal cabinet (DTC).[16]

## C. Performance under the Contracts

The initial notice to proceed for Contract 0042 was issued on October 16, 1990, effective November 2, 1990. The performance period for Contract 0042 was 180 days. The completion date was subsequently changed to July 27, 1991. The completion dates for Contracts 0014 and 0018 were set at July 11, 1991, and July 15, 1991, respectively. In October 1990 a preconstruction, post-award conference was held involving the contracting officer (CO), Mr. Pavliscsak, and representatives from IGGC and WJW, including Mr. Joseph Christiansen, president of IGGC, and Mr. Wesley. It was at this preconstruction conference that Mr. Wesley made his first inquiries into the specifics of the contract subject matter. The attendees went on a site visit to view the basement mechanical rooms and the MUX panels. Also at this meeting, Mr. Wesley first broached the possibility of substituting an Andover local-con-

trol device in the contract in place of the specified FID–MUX scheme.

On November 7, 1990, in a letter to IGGC, WJW presented a no-cost proposal for an Andover DDC system in lieu of the EMCS and local control specified. The proposed DDC would not interface or tie in with the existing EMCS. The existing EMCS would have remained intact, but WJW would not have performed any work relating to it. In effect, the nine buildings would only be controlled locally. Mr. Pavliscsak advised Mr. Wesley that he did not believe that the proposed approach would be approved. Mr. Curtis Oglesby, the Fort Gordon energy manager, met with Mr. Wesley and subsequently advised Mr. Wesley that Fort Gordon was not interested in the Andover system. Nevertheless, Mr. Wesley continued to inquire about providing an Andover system and was told by Mr. Pavliscsak that he would have to submit a proposal through the CO. Subsequently, Mr. Wesley submitted a set of drawings demonstrating the Andover system with communication lines to the MCR. WJW met with the government in October 1990 to demonstrate the Andover DDC system. The government, however, advised against the proposed action, stating that other HVAC installation vendors' requests for such a deviation would have to be approved as well and that this would create a problem in trying to maintain so many different DDC systems. This submittal, numbered "4," was disapproved on December 13, 1990.

On January 7, 1991, IGGC filed Submittal 4a with the CO, which included system drawings, equipment data, and a system description and analysis for a pneumatic local control utilizing a FID–MUX interface with the EMCS.[17] This submittal was disapproved by

15. Specifically, under Contracts 0014, 0018, and 0042, WJW agreed to furnish wiring diagrams, central control panels, check-out and calibration, data terminal cabinets, Infoscan cards, chill-water and hot-water flow sensors to connect with the existing EMCS in accordance with the contract plans and specifications. The total amount of WJW's purchase order for this work was $108,500, $108,500, and $99,950 respectively.

16. A DTC is merely an enclosure that contains wire termination strips, also known as a field termination panel. The DTC was located physi-

cally between the MUX and the data environment. It did not have a functional purpose with respect to the signals; in other words, the same number of wires went into the DTC as came out of the DTC.

17. This design, reflected in plaintiff's exhibit 56, involved wiring the data environments from the individual AHUs into one DTC, which would interface with an existing MUX panel in the basement.

Mr. Earl Hothem, as an authorized representative of the CO, on February 7, 1991. Resubmittal was required based on a January 30, 1991, meeting between Mr. Pavliscsak and Mr. Wesley. It was during this meeting that WJW was informed by Mr. Pavliscsak that the base expected a DDC–Infoscan interface under the contracts. It was also at this meeting that Mr. Pavliscsak first mentioned the requirement that, if FID–MUX was used, the local controls must be separated from the EMCS. Mr. Wesley balked at the latter requirement because of the additional cost it would entail; more MUX cards would be required to ensure separation of the EMCS from local control.[18]

On February, 26, 1991, IGGC filed Submittal 4b with the CO. This submittal was substantially similar to Submittal 4a, except that WJW proposed using pulse-width-modulated MUX cards instead of using a DDC–Infoscan interface.[19] The resubmittal was disapproved on March 29, 1991, this time with specific comments provided by Mr. Pavliscsak, including:[20] (1) inadequacy of a proposed wood backplane for the DTC; (2) lack of information on MUX panels; (3) insufficient MUX cards to allow control of AHUs; (4) inadequate uninterruptable power supply; (5) failure to design with specified current-to-pressure (I–P) transducer; (6) failure to use specified pneumatic valve; and (7) inappropriate mixing of local and EMCS controls in the same cabinet. WJW addressed these comments in a letter dated April 5, 1991, in which it contended that the DTC backplane, the MUX panels, the use of a pneumatic valve, and the separation of controls were not required by the specifications. WJW also requested information regarding the power needs for the FID panel and MUX cards.

At the time the contracts were let, there was only one existing MUX panel, which was located in the basement of Building 29720. There were no DTCs in any of the buildings. Under Contract 0042, each building was to have six AHU mechanical rooms.[21] As of March 29, 1991, only one building had been accepted by Fort Gordon, Building 29720. At this time, however, no connections were made between the DTCs and the MUX panels because Fort Gordon had not provided a wire list to IGGC. Building 29720 was accepted on an accelerated basis, with only local control, due to an anticipated need for space for wounded soldiers from the Persian Gulf War. This work was accepted despite the fact that no submittals were approved at that point. The HVAC system in Building 29720 was installed in March 1991 by plaintiff and WJW using an Andover DDC local control to meet the anticipated need for that building during the Desert Storm operation in Iraq. This building was not connected to the Fort Gordon EMCS.

On May 1, 1991, all interested persons met to discuss interfacing the installed Andover DDC system in Building 29720 using FIDs and MUXs, the Fort Gordon comments on Submittal 4b, the use of a Barber–Coleman transducer rather than a Fairchild transducer, separation of section 13C1 and section 15A1 components on the drawings, and workmanship on the wiring.[22] WJW was given permission to continue with the FID–MUX interface at this meeting.[23] The CO also

18. The number of MUX cards required in a system depends on the number of I/O points that must be combined by the MUX. Each MUX card has a finite number of points that it may combine.

19. According to Mr. Wesley, the pulse-width-modulation cards would have enabled the contractor to use a smaller number of MUX cards.

20. As Mr. James Bodine, the CO, testified at trial, Mr. Pavliscsak and other technical personnel in the EMCS office were consulted as to technical matters involving the disputed contracts. While the submittals were rejected by the CO, the reasoning for these rejections were often supplied by Mr. Pavliscsak or others. Mr. Bodine testified that he retained the right to reject the recommendations of those he consulted if he chose to do so.

21. These rooms contained the AHUs and other equipment necessary to control the AHUs, including local control. Under Contract 0042, these rooms were to be built by IGGC.

22. There were also some workmanship issues on wiring installed under the contracts. This work had been performed by Nash Electric, another subcontractor for IGGC. This work was unrelated to the work performed by WJW in dispute here.

23. It is apparent that by this time Fort Gordon had decided to allow WJW to use a FID–MUX approach, despite the fact that the CO took the

warned of the possibility of terminating the contracts.

WJW filed a third resubmittal on April 9, 1991, after receipt of Fort Gordon's comments to Submittal 4b. This submittal was disapproved by the CO on May 22, 1991. Specific reasons for disapproval were attached to the submittal; these were not presented at trial. In the interim, the CO served a cure notice on May 14, 1991, pertaining to Contract 0042 and citing "failure to submit acceptable submittals in a timely manner." Both Mr. Wesley and Mr. Christiansen testified that the need to rework their submittals repeatedly took valuable resources needed to perform work. Because of this, they requested that written direction be provided by Fort Gordon regarding verbal instructions and comments to ensure that the work was properly documented.

A meeting was held on June 7, 1991, to discuss the submittals on the IGGC contracts for the EMCS portion of the contracts; it was memorialized by Ms. Joan T. Mize, Fort Gordon contract administrator. At this meeting, Fort Gordon agreed to provide a MUX cabinet on Contract 0042.[24] Mr. Pavliscsak reminded WJW that he required the separation of EMCS controls from local controls on the submittal drawings. A further written directive was provided by the CO in a letter dated June 10, 1991, which required IGGC, and thus WJW, to: utilize the basement MUX panel in Building 29720; use six separate MUX panels in each AHU equipment room for Buildings 29707 and 29716; provide a relay schedule in the drawings; and separate the EMCS drawings from other drawings.

Fort Gordon interpreted the contract as requiring a MUX panel in each AHU room, while WJW interpreted the contract as representing the existence of MUX panels in the basement of each building. Although Fort Gordon disputed the MUX panel issue, it agreed to provide MUX cabinets to WJW, provided that WJW supplied the termination panels and MUX cards. According to defendant's version of the minutes from the June 7 meeting, Fort Gordon expressed a willingness to install a MUX cabinet in the basement of Building 29720 and provide cabinets to WJW for the remaining AHU rooms in the other buildings. Plaintiff, in their response to these minutes, claims that Fort Gordon committed to providing MUX panels, which would include field termination strips and MUX cards. The Army's interpretation would have required WJW to supply the termination strips and MUX cards.

The CO issued a show-cause notice for Contract 0042 on June 7, 1991, based upon the failure to provide acceptable submittals. He issued a cure notice for Contract 0014 on June 7, 1991, citing inadequate EMCS submittals. This notice was reissued on June 25, 1991. In a letter dated June 26, 1991, IGGC disputed the cure notices because WJW had not received the comments regarding their previous submittals until after subsequent submittals had been mailed.

On June 20, 1991, a fourth resubmittal[25] was furnished by IGGC covering the local controls under sections 15A1 and 15H6 and the EMCS under section 13C1; this was disapproved on June 28, 1991. The disapproval was accompanied by handwritten comments to the submitted drawings. The comments requested that WJW, in relation to the drawing for Buildings 29707 and 29716, "provide laptop computer for programming & giving training" and "clarify use of SCX9000 & control panel 'loops.'" The comments also requested separation of EMCS components from local control on the drawings. Mr. Pavliscsak provided comments to Ms. Mize to support disapproval. These comments covered a number of minor design details, in-

---

position that a DDC–Infoscan interface was required by the contract. It is unclear, however, when such a direction was given. The documents regarding the submittals seem to indicate a willingness on the part of the government to accept FID–MUX. Mr. Wesley testified that permission to use FID–MUX was given prior to the May 1, 1991, meeting.

24. This was agreed to under condition that it would not be an admission of error by Fort Gordon.

25. This resubmittal also was labeled "4c." While the notation may be confusing, it is clear that this submittal is separate from the previous submittal filed on April 9, 1991, which was also labeled "4c."

cluding the use of pulse-width modulation and the interpretation of typical drawings. It is apparent, based on WJW's response to these comments, that disagreements stemmed from disputes over what Fort Gordon had directed at the meetings preceding these submittals. For example, WJW took issue with the disapproval of pulse-width modulation in the interface because the submittal rejection "is the first time, verbal or written, that this has been disapproved."

WJW and IGGC considered a number of Fort Gordon's submittal comments to be related to typographical errors in the submittals. In a letter dated June 26, 1991, IGGC informed the CO that it would monitor future submittals to insure that Fort Gordon received the appropriate submittals as agreed in the June 7, 1991, meeting.

At this point, the court's ability to reconstruct what occurred is tenuous at best. The trails of the various disputes fade out inconclusively in all directions. In particular, the record is unclear as to the nature of subsequent submittals and whether any submittals were approved on any of the three contracts. What is clear is that, as late as August 15, 1991, specifications and submittals on Contracts 0014 and 0018 were still at issue.

The record is unclear as to what occurred between July 1991 and November 1991. WJW appears to have been working only on submittals for the three contracts. The parties continued to discuss the submittals. It is unclear whether any submittals were approved, although on August 1, 1991, Mr. Pavliscsak again expressed concern over the quality of the submittals: "I have the impression the subcontractor [WJW] is not giving the required time to provide a good submittal. The drawings submitted appear to be very rough drafts with numerous mistakes in wiring, labeling, and layout.... I feel like I am a WJW employee with the amount of work I am doing for him and yet he still will not give us a good submittal."

On August 2, 1991, a Fort Gordon mechanical engineer, in a letter to the CO, disapproved for numerous reasons shop drawings that accompanied IGGC submittals. These submittals were related to Contracts 0014 and 0018. On August 14, 1991, the CO issued another cure notice relating to Contract 0014 for failure to provide submittals on EMCS in a timely manner. On September 1, 1991, the CO issued a show-cause notice on Contract 0014, due to failure to cure conditions endangering performance. A cure notice was reissued on Contract 0014 on October 18, 1991. At this time the CO indicated that the percentage completion for the contract was 71%, short of the 81% required at that time. On December 9, 1991, a third cure notice on Contract 0014 was issued for failure to complete the contract by the completion date. As of November 14, 1991, according to WJW, testing had been completed on Contract 0042. According to plaintiff, by December 11, 1991, all work was completed by IGGC on Contract 0042 except for the wiring between the DTC and the MUX.

A "final" inspection was held on December 5, 1991. Mr. Christiansen testified that by this date the majority of work under Contract 0042, including the changes demanded by the Army, was substantially complete. On December 11, 1991, Fort Gordon provided a list of deficiencies raised during the inspection; this came to be referred to as the "prefinal punch list." [26] On December 18, 1991, the CO wrote a letter to IGGC regarding IGGC's comments on the December 11 punch list. It is at this point that the issue of software comes to the fore. According to IGGC, Contract 0042 was substantially complete as of August 1991; Contracts 0014 and 0018 were substantially complete as of November 14, 1991. By November 1991, the only work remaining on all the contracts, according to plaintiffs, was the wiring of the DTCs to the MUX panels, which was pending a final wire list from the government.

Between December 1991 and July 1992, when all three contracts were terminated for default, no work was performed by IGGC or WJW, aside from system check out and punch-list items. During this time, a dispute over whether the contracts called for soft-

---

**26.** The punch list later became a source of controversy. The government claims that it would not issue the *final* punch list until the job was ready for final inspection. IGGC and WJW noted that detailed punch lists were necessary in order for WJW to be ready for final inspection.

ware consumed the parties. The issue was whether the specifications required WJW to ensure that I/O points installed by IGGC and WJW were readable on the EMCS mainframe. Making the I/O points "read" on the EMCS would require access to the Fort Gordon mainframe.

IGGC also claims that Fort Gordon did not provide prompt comments regarding whether the punch-list items were satisfied. Thus, according to plaintiff, from May 1992 to July 1992, IGGC did no work as it was waiting for comments regarding the punch list. On April 10, 1992, the CO forwarded to IGGC information from EMCS personnel related to "repairs" on Contract 0042. The CO noted problems including lockups of the FID network, which were blamed on incompatible MUX cards, and incomplete system checkout. One problem that was detailed in the letter involved the failure of the system to measure the temperature of the room air and the air supply and return; this was blamed on poor placement of sensors.[27] Another problem cited was the failure of IGGC to provide adequate power-line surge protection.

On July 7, 1992, Mr. Earl Hothem, resident engineer at Fort Gordon, recommended that Contracts 0014 and 0018 be terminated because IGGC had not completed the work and had abandoned the contracts. On July 8, 1992, the CO issued another show-cause notice for Contract 0014, citing failure to complete the contract. The CO sent a list of deficiencies to IGGC on Contract 0042 on July 14, 1992. On July 24, 1992, the CO issued a finding and determination on Contracts 0014 and 0018 terminating the contracts for default. On July 27, 1992, the CO issued a finding and determination on Contract 0042, terminating the contract for default.

On September 1, 1992, the CO transmitted a list of deficiencies on Contract 0042 to Fidelity and Deposit Company of Maryland, IGGC's bonding company. The list of defi-

ciencies was generated by two Fort Gordon engineers during an inspection.

On October 26, 1992, Contracts 0014, 0018, and 0042 were reinstated after IGGC promised that WJW would not be the subcontractor: "The Contractor, by acceptance of this reinstatement agrees to provide an acceptable subcontractor to complete the controls and Energy Monitoring and Control System portion of the contract, in lieu of Wm. J. Wesley Company." All terms of the contracts, except for the contract completion date, remained the same. After the contracts were reinstated, IGGC used Building Automation Services (BAS) as the replacement subcontractor on the three contracts. According to Mr. Martin Casciola, a partner in BAS, he was contacted regarding the contracts sometime in August 1992, after IGGC was terminated. He testified that there were a number of fundamental problems with the project, including faulty wiring, instability of the system, bad MUX cards,[28] faulty temperature sensors, and other punch-list items. He also noted that there were mistakes in wiring of the DTCs. It took BAS thirty-three weeks to complete the work on all three contracts. This work included the installation of the "database" on the EMCS mainframe and point-to-point calibration. Mr. Casciola noted that the work was performed based on the punch list, not the contract specifications.

Plaintiff never adequately rebutted the testimony of Mr. Casciola. The court is forced to find that there were numerous problems with the quality of WJW's or Nash Electric's work.

On December 2, 1993, IGGC filed its claim with the CO in the amount of $1,056,257.88 for the three contracts. In its claim, plaintiff alleged that, because of the defective specifications and the government's interpretation of those specifications, IGGC and WJW endured numerous changes and delays. Plaintiff blamed the misinterpretation on conflict-

---

**27.** The location of sensors in the system was not specified by the contracts. According to the parties, sensor location depends on accepted industry practice.

**28.** He attributed the faulty cards to the length of time the cards were idle (without power) in a humid environment.

ing notes on Plates E–3, M–6, and M–7.[29] Plaintiff also alleged that termination of the contracts was unreasonable and led to delays and additional costs by IGGC. Plaintiff alleged that the government refused to cooperate with the contractor and subcontractor by insisting on its erroneous interpretation. The CO issued his final decision rejecting IGGC's claim on April 20, 1994. Plaintiff filed its complaint here on May 24, 1994.

## DISCUSSION

Plaintiff alleges that the government's specifications were defective; they did not express what Fort Gordon in fact wanted. As a result, according to plaintiff, the government subsequently imposed extracontractual requirements—i.e., the initial insistence on DDC instead of FID–MUX, database entry, separation of EMCS equipment from local control, metal DTC backplanes, additional DTCs and MUX panels, and additional MUX cards—all of which caused plaintiff extensive delays and additional costs.

The dispute, insofar as liability is concerned, can be organized into three categories: (1) claims that arise from the conflicting interpretation of the contract specifications; (2) claims that arise during performance of the contracts, unrelated to contract interpretation; and (3) claims related to the termination of the contracts at issue. The following issues were addressed during trial:

1. Did Contract 0042 *require* the contractor to provide direct digital local control and thus a DDC–Infoscan interface?

2. Was "software" or database entry by the contractor required under Contract 0042?

3. Was the requirement of separation of EMCS equipment from local-control equipment beyond the scope of the contract?

4. Was the Barber–Coleman I–P transducer the equivalent of the specified Fairchild I–P transducer?

5. Were the DTC backplanes used by WJW compliant with the contract?

6. Were the additional DTCs and MUX panels beyond the scope of the contract?

7. Was the contractor obliged to provide MUX cards compatible with the upgraded EMCS?

8. Was the termination of IGGC improper?

Defendant argues that its interpretation of the contract specifications was correct and that the specifications were not defective, as indicated by the ability of BAS, the replacement subcontractor, to complete the contracts with only minor changes to the specifications. Defendant contends that Fort Gordon fully cooperated with plaintiff throughout the administration of the contract; it cites the government's willingness to allow the use of a FID–MUX interface, to supply MUX cabinets, and to accommodate plaintiff's changes to the system design.

### A. *Dispute over DDC–Infoscan Interface*

█ The first major dispute involves the parties' initial conflict over what the contract intended with respect to interfacing the local control with the EMCS. Only after five days of trial did it become apparent to the court that what Fort Gordon really wanted was a HVAC system with a DDC–Infoscan interface to the Fort Gordon EMCS—a cheaper, better alternative to the standard FID–MUX interface. This came as a hard-won revelation to the court because there is not one word in the specifications that makes this desire known and, indeed, a great deal that suggests the contrary.

Section 13C1 contains language that supports plaintiff's position. Paragraph 5.1 describes the FIDs: "FIDs are existing and will be connected to new instruments via existing MUX panels." At paragraph 5.2 the bidder is instructed that:

MUX panels exist and may be used to connect the DE to the system and shall contain all necessary I–O functions to con-

---

29. Plaintiff contends that Plate E–3 indicated that only two Infoscan MUX cards were required for Building 29707 and that Plate M–6 and M–7 indicated that the contractor was to supply all Infoscan MUX cards required for all three buildings. At trial, Mr. Wesley interpreted Plate E–3 as providing a specific number of MUX cards for Building 29707 only.

nect to field sensors and control devices. MUX panel operation shall be fully supervised by the system to detect MUX panel failures.

Section 15A1, paragraph 12, states with relation to local control: "Automatic temperature controls shall be electric, electronic, solid-state electronic, or pneumatic type, or a combination thereof that will provide the required sequence of operation control." These provisions make it clear that, as far as the specifications are concerned, the contractor has the choice to use any type of local control and that the equipment for using a FID–MUX interface with the EMCS is existing and available. There is no specific mention in section 13C1, which is the EMCS specification, of the type of interface required; all that is required is that the contractor provide "a complete functional Energy Monitoring and Control System as specified herein and as indicated on the . . . drawings." Section 13C1 does provide that: "[The contractor shall p]rovide a DTC as an interface between each MUX and the DE instrumentation and controls." This indicates that, contrary to the drawings as discussed below, no other type of interface is contemplated; the DE should be connected to the EMCS via the DTC and MUX.

It turns out, however, that this was not what Mr. Pavliscsak intended in drafting section 13C1. Of the nine buildings covered under the three contracts, only Building 29707 had an existing MUX panel, and, for that one building only, the contractor was to be permitted to utilize the existing equipment to tie into the EMCS. Laying out that option in paragraph 5.2, however, created the unintended but entirely understandable impression that FID–MUX interfaces were to be expected everywhere. Although it could not have been less clear, the real intent as to the other buildings was that all tie-ins were to be through the cheaper and tidier means of the DDC–Infoscan interface. This intent was only reflected by three clues tucked away neatly in a mass of technical drawings.

No hint existed in the specifications themselves.

There are two references to electronic local control—the broad category that encompasses DDC—on Plate M–6, entitled "EQUIPMENT SCHEDULES & CONTROL DIAGRAM: BLDG'S 29707, 29716, AND 29720." First, note 2 at the bottom of the EMCS I/O TABLE [30] reads:

> CONTRACTOR TO PROVIDE FOR EACH BUILDING ONE DDC CLOSED LOOP CONTROLLER TO INFO–SCAN INTERFACE. LOCATE IN THE BASEMENT EQUIPMENT ROOM OF EACH BUILDING.

Second, note 1 under the heading "HVAC TEMPERATURE CONTROLS—SEQUENCE OF OPERATION" reads:

> EACH AIR HANDLING UNIT SHALL BE CONTROLLED BY AN ELECTRONIC AHU CONTROLLER AND TIME CLOCK.

Defendant interprets this provision as calling for a DDC because it refers to an "electronic AHU controller." Plaintiff testified that a DDC is only one type of electronic AHU controller. These notes on Plate M–6 under the EMCS I/O table cannot be reconciled with the specifications.

The final reference is on Plate M–7, entitled "MECHANICAL PLANS AND NOTES, BLDG. 29707." This drawing depicts the physical layout of parts of Building 29707, including the basement mechanical equipment room. In Detail A of Plate M–7, a sketch of the connectivity of local controls depicts a box with tubing connecting the AHU DDC and a data terminal cabinet (DTC); this box is labeled "DDC TO INFOSCAN INTERFACE." This box is noted as "TYPICAL FOR BLDG'S. 29707, 29716 & 29720."

What were Wesley's obligations on seeing these references to a DDC–Infoscan interface? The specification and the drawings seem to conflict: Paragraph 5.2 clearly de-

---

**30.** The I/O table lists each I/O point for the AHU mechanical room and describes the point as either a digital output, analog output, digital input, or analog input. For example, "Room Temperature 1" is the first point listed on the EMCS I/O table on Plate M–6; it is listed as an analog input, which means that the point, a temperature sensor, feeds data to the system corresponding to the room temperature. A digital input would only indicate whether the sensor was on or off.

scribes an interface between the EMCS and the MUX panel, while Plate M–6 implicate a DDC–Infoscan interface. Plaintiff argues that the specifications require a mechanical system that involves a FID–MUX interface. Defendant argues that the drawings clearly require the use of a DDC–Infoscan interface. On its face, the contract would appear to be ambiguous as to which system was required.

■ As a general rule, an ambiguity will be construed against the drafter under the doctrine of *contra proferentum. See Gorn Corp. v. United States*, 191 Ct.Cl. 560, 566, 424 F.2d 588, 592 (1970). Such an inference against the drafter, however, is not appropriate where the ambiguity is patent. In that event, the bidder is required to seek clarification prior to submitting a bid. *See Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474–75 (Fed.Cir.1997).

■ The Federal Acquisition Regulation (FAR), however, must also be considered. The "Specifications and Drawings for Construction" clause, which is mandatory for fixed-price construction contracts, provides in part:

> Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. *In case of difference between drawings and specifications, the specifications shall govern.* In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer....

48 C.F.R. § 52.236–21 (1994) (emphasis added). The clause thus gives preference to the specifications where they conflict with the drawings. "An order of precedence clause may be relied on to resolve a discrepancy between the specifications and drawings even though the discrepancy is known to the contractor prior to bid or is patent." [31] *Hensel Phelps Constr. Co. v. United States*, 886 F.2d 1296, 1299 (Fed.Cir.1989).

■ Construing the whole contract in light of the order of preference therefore yields a single result: Section 15A1 gives a choice as to which type of local control is acceptable; section 13C1 indicates that a FID–MUX interface is desired. While the notes on the drawings indicate otherwise, the specifications take precedence over those drawings as to the local-control requirement. Neither plaintiff nor WJW had an obligation to seek clarification of the ambiguity because the Specifications and Drawings Clause clarified the issue.

■ Even if the contractor had inquired, nothing short of a complete revision of the contract would have produced a proper interpretation consistent with Mr. Pavliscsak's real intentions. The existing contract cannot be fairly interpreted as requiring a DDC–Infoscan interface. "In deciding the correct meaning of a contract containing a patent ambiguity it is proper to consider the trade standards and practices of the relevant business community." *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir. 1985). At the time of the contract, the Department of Defense prohibited the use of DDC for local control where EMCS was also in place. WJW knew this. Fort Gordon did not have any DDC systems in place at the time of the contract. No mention is made of DDC in either the specification or the other EMCS drawings, namely Plate E–3.[32] Finally, the equipment specified in the drawings could be fully operational and everything called for by the specifications fully implemented by simply ignoring the references to DDC.[33]

---

**31.** Where a contract contains conflicting order-of-preference clauses, such as sections 52.214–29 (Order of Precedence—Sealed Bidding) and 52.236–21 (Specifications and Drawings Clause for Construction), the mandatory clause controls over the nonmandatory clause. *See Hickman Mechanical, Inc.*, ASBCA No. 46492, 94–2 B.C.A. (CCH) ¶ 26,914, at 134,014, 1994 WL 171594 (1994); *Walter Y. Arakaki, General Contractor, Inc.*, ASBCA No. 42536, 92–1 B.C.A. (CCH) ¶ 24,-369, at 121,741, 1991 WL 186184 (1991).

**32.** Mr. Wesley testified that he regarded the reference to a DDC cabinet in Detail A of Plate M–7 as a typographical error.

**33.** In short, IGGC's plan to have WJW tie the HVAC AHUs, DEs, I/Os, and UPSs to the EMCS MCR via FID–MUX connected through DTC's in lieu of a DDC–Infoscan interface made sense, once the court figured out the acronyms.

The import of this conclusion on plaintiff's ability to recover, however, is not clear. Although this dispute added dramatically to the breakdown between the parties, the government acquiesced to plaintiff's interpretation early on and allowed WJW to use a FID–MUX interface instead of the desired DDC–Infoscan interface. As will be seen, however, this confusion had relevant repercussions.

## B. *"Software" or Data Entry*

■ A second substantial dispute about the meaning of the specifications concerns whether the plaintiff was required to do the data entry [34] by which the EMCS could actually monitor the DE and control the AHUs in the nine buildings. This one dispute, more than any other, was responsible for the paralysis that set in after December 1991. IGGC eventually subcontracted with BAS, the replacement subcontractor, to do the necessary data entry,[35] and now seeks to be compensated for the direct costs associated with that work, as well as the delay and impact damages associated with the dispute.

On this issue, the court agrees with the government that the specifications clearly called for plaintiff to make the necessary computer connections to the EMCS so that "[t]he system shall provide operator interaction and dynamic process manipulation, including overall system supervision, coordination, and control." First, the purpose of the EMCS and section 13C1 of the specifications was to include the buildings under the contracts within the monitoring sphere of the central EMCS computer. This purpose requires the ability of the computer to read and recognize the various data inputs from each building. Furthermore, there are simply too many references in section 13C1 to tasks that could only be satisfied by data entry. For example, the specification required the contractor to perform field tests and calibration of the equipment: "The [contractor] shall calibrate each instrumentation device connected to the EMCS by making a comparison between the reading at the device and the display at the MCR...." [36] This reference to the display at the MCR indicates that the contractor was expected to provide for the entry of the I/O points from the various buildings into the main database. Thus database entry on the EMCS central computer was a requirement under the contracts.

Whether this work constitutes "software" is irrelevant. It is whatever it is. There was no disclaimer in the specifications that the plaintiff did not have to do any software installation. Unlike the previous issue, there were no contradictory instructions in the contract. The work consisted simply of entering data points into the existing mainframe database so that the mainframe could recognize data coming from these new I/O points and could, in turn, send signals to them. The fact that the existing contractor that operated the CPU might be in a better position to do that work is also irrelevant. The plaintiff was hired to do it.

## C. *The Submittals*

During the course of the review of IGGC's submittals, three major issues arose regarding WJW's proposed designs: (1) separation of EMCS from local control; (2) the adequacy of the proposed Barber–Coleman I–P transducers; and (3) the adequacy of the proposed wood DTC backplanes under the contract. Because the show-cause orders and the ultimate termination for default were predicated, in part, on the inadequacy of IGGC's submittals, it is important to evaluate

---

**34.** Throughout this litigation, both parties have referred to requirements for "software" under the contract. The court finds this term to be misleading. What is disputed is not whether software applications were required under the contract, but rather whether the contractor was required to ensure that the various points are recognized by the EMCS. This task required some data entry and access to the EMCS central computer.

**35.** The fact that BAS was able to complete the work leads to no inferences favorable to the government here. The evidence was that BAS did not work from original contract documents but from punch lists, which plaintiff argues contained extracontractual requirements.

**36.** The requirement that points be displayed with particular accuracy also appears in section 13C1, paragraphs 3.3.1 through 3.3.3. This "display" requirement necessarily implicates data entry to ensure that points appear on the system.

the reasonableness of the termination in light of the submittals.

### 1. Separation of EMCS and local controls

██ Plaintiff alleges that the requirement of separation imposed extracontractual work on IGGC and WJW. The controversy regarding the separation of EMCS and local controls was unclear until trial. It is now apparent that Fort Gordon required both physical and conceptual separation of EMCS components from local control, not merely a redrafting of the drawings. Mr. Pavliscsak testified that it was not separation on the drawings that was at issue. He testified that WJW improperly planned to locate EMCS and local-control components in the same cabinets and to share certain components between the EMCS and local controls. According to Mr. Pavliscsak, only the final element—e.g., a valve or a sensor—should be shared. The power supply and input and output signal lines should not be shared. In other words, the local control and the EMCS control should only interface at the final element by an on-line relay.[37] This requirement was imposed by Fort Gordon after WJW obtained approval to proceed with a FID–MUX interface, because Fort Gordon did not want items, such as sensors and valves, shared between the EMCS and local control if a FID–MUX interface was utilized instead of a DDC–Infoscan interface.

Mr. Pavliscsak explained this need as follows:

Being located in the local control cabinet, if that control cabinet failed, this [static pressure] sensor failed. I also needed that sensor on the EMCS so I could control the fan speed. That would have been the final element in this loop, was the fan speed. So if it failed, I was down.

The way it had to be was [Mr. Wesley] had his sensor that worked off of his system and I had to have one that worked off the EMCS system regardless of whether the other systems were up or down. We did the same thing with the valves. Mr. Wesley wanted to interrupt the [electronic]

signal ... coming out of the EMCS and coming out of his ... controls and swap the signals to [a current-to-pressure transducer].... If his cabinet went down and I lost whatever voltages we had around that was feeding the I/P, I couldn't get that signal to that valve in the local control cabinet, because I was not interfaced to the final element, I was interfaced to an element further up the line.

(Tr. at 903–04.)

Mr. Pavliscsak's concerns may make sense, but there is no provision in the specifications or the drawings that would require the separation of EMCS and local-control components. Moreover, another reason given for the separation requirement—that the installation and maintenance of EMCS and local control are performed by two separate entities—is not compelling. While the Army may have wanted all EMCS components to be housed in separate cabinets from the local control to prevent dependence of the EMCS on local-control power, it is inconsistent with the Army's stated, original intent for the contract, DDC–Infoscan interface. A DDC–Infoscan structure would also depend, inherently, on the power supply of the local control. WJW's proposal was to share some sensors and other functions between the local control and the EMCS; this is how they chose to make the FID–MUX interface more cost effective. To a certain extent, that is what makes the DDC–Infoscan interface desirable in the eyes of Fort Gordon; the DDC would only require one connection to the EMCS with no redundancy between the systems. Thus the requirement for separation of the EMCS from local-control equipment was outside the scope of the contract.

Nevertheless, WJW undertook to satisfy this requirement for separation. The result was the redesign of the systems and an increase in the number of components. Separation meant that WJW had to duplicate many of the sensors and control devices in the DE; this led to an increase in the number of I/O points, which in turn led to an

---

**37.** The on-line relay, according to Mr. Pavliscsak, acted as a switch between the local-control signal and the EMCS control signal.

increase in the number of MUX cards necessary to support those I/O points.

### 2. I–P transducers

■■■ WJW proposed in its submittals to use Barber–Coleman CP–8551 electronic-pneumatic transducers (I–P transducers) within section 15A1 local control.[38] The I–P transducers are described in Plate E–3, EMCS note 5: "Current–to–Pressure transducers (I/P) are to be FAIRCHILD model T–5000–04 (input 4–20 ma dc/output 3–15 psig/ filtered 20 psig supply) or equivalent." The dispute is whether the Barber–Coleman I–P transducers are truly the equivalent of the Fairchild I–P transducers.

Both models of I–P transducers have the same input/output signal range. There are, however, three differences between the two models: (1) the Fairchild model had a physically flexible input/output connection, which the Barber–Coleman model lacked; (2) the Fairchild model had a removable metal housing protecting the mechanism while the Barber–Coleman model had a plastic housing or exposed printed-circuit board; and (3) the Fairchild model was easily calibrated, while the Barber–Coleman model required the breaking of a factory seal to calibrate the transducer.

Mr. Pavliscsak testified that the Barber–Coleman I–P transducers were inadequate because of problems experienced with that particular model "hanging up" during operation. He preferred the Fairchild model. According to plaintiffs, the Barber–Coleman transducer was more accurate and efficient. It is also less expensive than the Fairchild model. WJW was a licensed distributor of Barber–Coleman products and represented to Fort Gordon that they would warrant the transducers.

While there are differences between the two models, it is not necessary that the proposed I–P transducer be identical to the Fairchild, only equivalent. *See Urban Plumbing & Heating Co. v. United States,* 187 Ct.Cl. 15, 23 n. 3, 408 F.2d 382, 386 n. 3

(1969); *Jack Stone Co. v. United States,* 170 Ct.Cl. 281, 286–87, 344 F.2d 370, 375 (1965).

The overriding consideration in determining the equivalency of an offered product for purposes of acceptability is *whether the "equal" product performs the needed function in a like manner and with the desired results* . . . . The procuring agency enjoys a reasonable degree of discretion in determining whether a particular product meets the solicitation's technical requirements as set forth in the salient characteristics, which we will not disturb unless it is shown to be unreasonable.

*Matter of Solid Waste Integrated Sys. Corp.,* No. B–258544, 95–1 C.P.D. ¶ 23, at 4 (Comp. Gen.1995) (emphasis added) (citations omitted) (addressing dispute under the "brand name or equal" clause, Defense Federal Acquisition Regulation Supplement § 252.210–7000 (1991)).

In this case, the contract drawings required a particular range of input and output; both transducers satisfy that criteria. The contract does not indicate any other criteria. The two transducer models perform the same function within the system design. While the stated differences between the models can be significant, they can also be compensated for in the design and their placement within the system. If Fort Gordon was adamant about not using the Barber–Coleman model, the specifications and drawings should have reflected those concerns. The insistence for a different I–P transducer by Fort Gordon was outside the scope of the contract.

### 3. DTC backplanes

■■■ IGGC submitted a proposal that included a DTC, as required under the contract. The DTC was merely an enclosure that would contain wiring terminal strips to provide easy maintenance and rewiring of the system. Each DTC had a backplane, upon which the terminal strips would be mounted. The submittal did not specify a particular type of backplane. Fort Gordon, however, reiterated a metal-backplane re-

---

**38.** The I–P transducers convert an electric signal from the EMCS to a corresponding pneumatic signal (pressure) for controlling a particular de-

vice. They are depicted in the schematic of a "typical EMCS pneumatic interface" described on Plate E–3.

quirement in its comments to the IGGC submittals. Ultimately, WJW installed some DTCs with particle-board backplanes. Plaintiff claims that the requirement that the backplanes be metal was unreasonable and outside the contract.

Neither the specifications nor the drawings mention the DTC backplanes. There are no stated requirements for the backplanes in particular. However, section 13C1 requires that: "All new field equipment shall be rated for continuous operation under ambient environmental conditions of 25 to 125 degrees F. dry bulb and 10 to 95 percent relative humidity, noncondensing." Mr. Pavliscsak testified that particle board would not withstand such conditions. In addition, Mr. Pavliscsak testified that the fire code did not allow wood to be used in equipment rooms. Plaintiff adduced no evidence at trial to rebut this testimony. Fort Gordon's requirement that the backplanes be metal is reasonable and consistent with the contract requirements.

D. *Additional DTCs and MUX Panels*

▮ Plaintiff contends that the government exceeded the scope of the contract by requiring MUX panels, a DTC, and an UPS in each AHU room. Plaintiff relies on paragraph 5.2 of section 13C1 of the specifications, which indicates that MUX panels exist. Plaintiff also relies on the absence of any limitation in the contract as to the location of the DTC and the UPS.

The requirement of additional MUX panels, a DTC, and a UPS, is related to Fort Gordon's demand that the EMCS and the local-control components be separated physically. As mentioned above, this separation resulted in the duplication of numerous data elements in the DE. In essence, Fort Gordon, by requiring duplication of the data elements, created the need for additional MUX cards to handle the increase in the number of inputs. This, in turn, led to the

need for the additional MUX panels. MUX cards, DTCs, and UPSs. Fort Gordon agreed to supply the additional MUX cabinets, but this only solved part of the problem.

1. MUX panel location

There is no indication in the contract, specification, or drawings that the MUX panels are to be in a particular location. The first indication that Fort Gordon wanted the MUX panels in a particular location, other than the existing locations, was at the June 7, 1991, meeting. According to plaintiff, Fort Gordon personnel decided during that meeting to locate a MUX panel in each AHU mechanical room for Buildings 29707 and 29716 and in the basement of Building 29720. Mr. Pavliscsak testified that this decision was based on practical considerations; placing a MUX panel at each AHU would minimize the number of wires that WJW would need to bring to the existing basement MUX panels. This problem, however, was created by Fort Gordon's requirement of separation. The separation requirement created more I/O points which increased the number of wires necessary to tie in those points to the MUX. The practicality of the location of MUX panels arose from the *ultra vires* requirement of separation.

2. Additional MUX cards

The number of MUX cards required increased dramatically after Fort Gordon directed the separation of controls.[39] Plaintiff and WJW were still operating under the assumption that "MUX panels exist."[40] But which party was responsible for supplying those additional MUX cards? Plaintiff argues that the MUX panels, which include the cards and data terminal strips, were to exist under the contract and the Army had an obligation to supply and install the MUX cards.[41] The government argues that the

---

**39.** The number of input signals that can be processed by each MUX card is limited. Depending on the size of the card, more cards may be required if the number of I/O points, which generate the signals. increases beyond the capacity of the existing cards.

**40.** The court notes that this dispute, while involving the same specification provision, is different

than the question addressed above regarding the DDC–Infoscan interface. Here, the FID–MUX interface is assumed to have been approved by Fort Gordon, albeit after the contracts were let.

**41.** It would also be the government's obligation to ensure that data terminal strips were provided within the cabinet as well.

plaintiff contracted to supply the necessary number of MUX cards and thus is required to supply enough despite the increase.

The contract specifications state that "MUX panels exist." On the other hand, Plate E–3, note 10, provides that the: "Contractor is to provide all EMCS interface cards as required." [42] Plate E–3 also contains a separate note at the bottom that states: "contractor to provide two Infoscan UNI cards for each building." Mr. Wesley testified that he was only required to provide two cards for Building 29707 according to this note.[43] He also testified that he was not expected to install the cards, only to provide them to Fort Gordon. There is no other mention of the number of required MUX cards in the specifications or drawings. It is apparent that, while some MUX panels existed, the contract contemplated that IGGC and WJW would need to supply more MUX cards. The drawings specified only two cards for Building 29707 but were silent regarding the other buildings. Plaintiff, however, was obligated to supply only what was necessary under the original terms of the contract: two MUX cards for Building 29707 and as many as required for the other two buildings under Contract 0042. Plaintiff was therefore responsible for furnishing a sufficient number of cards to satisfy the contract requirements. Any additional cards that would be necessary as a result of the separation of EMCS and local controls are the responsibility of the government.

### 3. DTC location

At the June 7, 1991, meeting, Fort Gordon personnel, through Ms. Mize and the CO, also directed WJW to provide a DTC and a UPS in each AHU mechanical room. There is no provision in the contract, specifications, or drawings that dictates the location of the DTC. Paragraphs 5.3.1–5.3.4 of section 13C1 outline the requirements for the DTC; there is no mention of location. The only requirement is that the DTC be an "independent metallic enclosure not physically part of the

FID or MUX." The specification also states: "No instrumentation or control devices shall be located with in [sic] the DTC." It is apparent that the requirement of DTCs in each AHU room was imposed after the contract was let, was a direct result of the separation requirement, and was not contained in the contract or specifications. This requirement is beyond the scope of the contract. The requirement that EMCS equipment be placed within the DTCs, in conflict with the specifications, is also beyond the scope of the contract.

### 4. Power supplies

Regarding the power supplies, Mr. Pavliscsak testified that the only requirement was that whatever solution was used should provide backup power for at least fifteen minutes. Plate E–3, note 12, requires the contractor to "[p]rovide true on line [UPS] with . . . a minimum of 15 minutes capacity on feeder circuit with local disconnect to FID/MUX cabinets." This note does not indicate the location of the UPS; it only dictates that fifteen minutes of backup is available for the EMCS. This is consistent with Mr. Pavliscsak's statement. The problem arose during the June 7 meeting: "DTC panels and UPS, as specified, shall also be provided by the Contractor. One of each will be required for each air handling system." Again, this requirement seems to stem from the additional components required by the separation of the EMCS and local control. Mr. Pavliscsak testified that:

> [T]he only issue we had on the battery backup unit was they didn't put in the right size.
>
> . . . .
>
> . . . It related back to the prints where we told him we wanted to back up for 15 minutes. And a lot of that backup time was directly related to whatever components he installed. The components would use different currents, different wattages, let's call it a wattage rating. His UPS had to total up to the total number of watts

---

42. The EMCS interface cards are the "Infoscan UNI" cards, which are also referred to as MUX cards.

43. "Building: 29707" appears beneath the note. Mr. Wesley testified that this indicated that the number of cards was set for Building 29707, but not for Buildings 29720 or 29716.

that the equipment was [sic] that was connected to it and it had to stay on line for at least 15 minutes. So it was directly related to whatever the contractor installed.... [H]e had to size it according to his components.

(Tr. of 12/8/97, at 895.) Because the inadequacy of the UPS was the result of additional components mandated by Fort Gordon to separate the EMCS and local-control equipment, the requirement is outside the scope of the original contract.

### E. Rework of MUX Cards

█ Another point of dispute involves the requirement by Fort Gordon that IGGC rework or replace the MUX cards installed by WJW. Plaintiff contends that the requirement was based on a compatibility problem that arose after the contracts were let; in other words Fort Gordon caused the incompatibility when it upgraded the system to implement newer electrical standards.

At the time the contracts were let, the EMCS ran on the RS–422 electrical standard.[44] The EMCS was later upgraded, in the summer of 1991, to the newer RS–485 electrical standard.[45] In a letter from the CO dated April 10, 1992, Fort Gordon notified IGGC that there were problems with the MUX cards installed in Buildings 29720, 29716, and 29707. This letter mentioned the apparent lack of compatibility between the cards and the FIDs; the installed cards used the RS–422 standard while the FIDs used the RS–485 standard. Prior to the upgrade, the government had given WJW permission to supply reconditioned UNI cards, provided that they were "like new" and could work with the EMCS system. According to the government, the Fort Gordon EMCS upgrade should not have affected any of the field communications, including the FIDs; the RS–422-based reconditioned cards

should have been adequate, provided that they were newer than November 1985. The April 10 letter raised the possibility that the incompatibility arose from the use of inadequate reconditioned cards, i.e., cards dated before November 1985.[46] The CO enclosed a list of necessary changes to the cards to meet the stipulation for using reconditioned cards. The work was ultimately performed by Building Automation Systems (BAS), the follow-on subcontractor after the IGGC contract was reinstated. This work was backcharged to WJW by IGGC.

Plaintiff contends that the additional work to alter these cards arose from the imposition of a new communications protocol by Fort Gordon after the contract was let. This characterization is not entirely accurate. It is true that the requirement that the MUX cards use the RS–485 standard is not explicitly laid out in the contract. The problem raised by Fort Gordon, however, is not that the contractor did not provide RS–485 MUX cards; it is that the contractor did not provide MUX cards that would work on the EMCS. The RS–422 standard is compatible with the EMCS; the court heard testimony that the EMCS is capable of interfacing with cards that use either standard. It is clear from the April 10 letter that Fort Gordon was requiring that the contractor adhere to a prior agreement, in which the government agreed to allow WJW to supply reconditioned, RS–422-based MUX cards:

The cards supplied under this contract would not communicate properly on the existing FID loops. The installed FID protocol (RS–422 and 485) supports up to 32 drives. Cards installed by contract use RS–422 protocol which supports a minimum of 16 drives. The government agreed to allow the use of reconditioned "like new" cards, with the stipulation they must be later than November [1985] edi-

---

44. RS–422 and RS–485 are standards, promulgated by the Electronic Industries Association, for electrical transmission of analog data. The differences lie in the transmission speeds and the distance across which transmission is capable. *See generally* ANDREW S. TANENBAUM, COMPUTER NETWORKS 76–78 (2d ed.1989) (discussing the RS–232–C and RS–449 analog-transmission standards).

45. The system was upgraded to RS–485 to improve system speed. In addition, the upgrade doubled the capability of the FIDs, such that twice the amount of information could be processed than under the older protocol.

46. It is unclear whether the cards furnished by WJW were indeed versions older than November 1985.

tion and be 100% compatible with the IN-FOSCAN version used by Fort Gordon.

Furthermore, Mr. Casciola, a partner in BAS, testified that the problems he encountered with the MUX cards were not wholly related to the difference in protocol.

Q: Now what sort of repairs did you do on the [MUX] cards?

A: Those would be the same cards we spoke about before, it was mostly just failed components and we had some sockets on the memory chips, a lot of them [sic] that the sockets on the memory chips were corroded a little bit. Any kind of resistance you get on a processor with a high speed data transfers and stuff on a computer card like that, you can't have any type of resistance in the connections or it won't work.

(Tr. of 12/8/97, at 836.) Mr. Casciola further testified that the rework of the MUX cards performed by BAS did not upgrade the cards from RS–422 to RS–485:

I wanted to make sure the job was up and running without making any changes to the cards. So *after the job was accepted and signed off,* then I went ahead and upgraded them to 485 chips at our own expense.... We did it after the job was accepted, you know, just to make sure that it was not an issue that the cards were the problem.[47]

(*Id.* at 837–38 (emphasis added).)

Plaintiff was obligated under the contract to provide a functioning interface between the local controls and the EMCS. While plaintiff argues otherwise, it is apparent that the cards supplied by plaintiff were not adequate and required repair. This repair was not the result of a change in the communication standard but rather deterioration or poor workmanship on the MUX cards supplied. Thus the government's demand that the cards be reworked was not outside the scope of the contract.

### F.  *Termination for Default*

Plaintiff asserts that all three contracts were improperly terminated for default. It

relies primarily on the fact that the contracts were reinstated later on the express condition that WJW would not be utilized as the subcontractor as an indicator of bad faith on the part of Fort Gordon.

▬▬ Termination of a contractor for default is a drastic sanction; such action should only be taken on good grounds and solid evidence. *See J.D. Hedin Constr. Co. v. United States,* 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969). The default provision applicable to the contracts here provides:

If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work ... that has been delayed.

48 C.F.R. § 52.249–10 (1991) (fixed-price construction). The government bears the burden of proving whether a termination for default is justified. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987). This burden can be satisfied by demonstrating by a preponderance of evidence that the contractor failed to perform in accordance with contract. *See id.* There must have been a "reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Id.* (quoting *RFI Shield–Rooms,* ASBCA Nos. 17374, 17991, 77–2 B.C.A. (CCH) ¶ 12,714, 1977 WL 2320 (1977)). Once the government has satisfied this burden, it is up to the contractor to prove that it had an excuse. *See* 48 C.F.R. § 52.249–10.

▬▬ Contracts 0014 and 0018 were terminated for default on July 24, 1992, because the contractor had not installed the requisite database such that the database points for the buildings register in the EMCS MCR. The termination letter for each of the two contracts contains the same language:

merely involved replacing a single communications chip on the cards.

---

**47.** Both Mr. Casciola and Richard Rusek testified that upgrading MUX cards to the newer standard

The contractor has installed the majority of the hardware for the heating and air conditioning. Some of the EMCS equipment is installed in the buildings but it is not operational. As of this date the database has not been installed in the computer in the EMCS Master Control Room. Until this portion of the work is completed it is not practical to determine if the installed equipment is functional. As of this time the equipment can only be controlled in the facility instead of from the EMCS Master Control Room as required. Additionally, the Government's EMCS personnel have no means of monitoring the operation of the equipment installed in these facilities.

[T]he contractor was directed on April 9, 1992 to install the necessary database to make the system operational. As of this date this has not been done. Conversely, the contractor and their subcontractor have bombarded the Government with paperwork refuting all Government instructions/comments concerning the matter.

The government cited IGGC's "effected refusal to complete the work" as the basis for default termination.

The court has already found that database entry such that database points register on the main computer in the EMCS MCR is a contract deliverable under all three contracts. It is uncontested that, prior to the default termination, plaintiff never attempted to perform the relatively simple task of entering the database points on the main computer. No work was performed on Contracts 0014 and 0018 between March and July 1992. During that time, plaintiff insisted that database entry was not required; a position that proved to be incorrect. The "software" or database entry requirement is a material

contractual obligation; without it, the EMCS work would be meaningless, as the various DEs would not read on the MCR. WJW's refusal to perform that obligation justifies termination for default. *See State of Florida v. United States*, 33 Fed.Cl. 188, 196 (1995), *aff'd*, 81 F.3d 1093 (Fed.Cir.1996).

Plaintiff has offered no valid excuse for failing to perform this critical aspect of the contract.[48] Instead, it suggests that the default termination was the result of animus towards its subcontractor, WJW, particularly on the part of Mr. Pavliscsak. While the court recognizes that there was and is some friction between Mr. Pavliscsak and Mr. Wesley, such friction arose from differing interpretations of the contract requirements, not from a fundamental, irreconcilable personality difference. It is true that the contracts were only reinstated once IGGC agreed to use a subcontractor other than WJW. That fact alone, however, is insufficient to support a finding of bad faith on the part of the government.[49] Contracts 0014 and 0018 were thus properly terminated for default because plaintiff did not provide an operating system for the six buildings involved as per the contract.

■ Contract 0042 was terminated for default on July 27, 1992, because of faulty MUX cards installed by plaintiff and because a point-to-point calibration was never completed:

Some of the EMCS equipment is installed in the buildings but it has never been fully operational. The Universal Function Cards continue to have numerous unexplained failures. Individual points, analog points are constantly changing values in large increments, plus lockup of FID network to the point the Government was

**48.** The court notes that plaintiff was not without recourse if its position was correct. Plaintiff could have performed the database entry, even if an outside consultant was necessary, and sought an equitable adjustment after performance was accepted. *See, e.g., Melville Energy Sys., Inc. v. United States*, 33 Fed.Cl. 616, 619 (1995), *aff'd*, 81 F.3d 1093 (Fed.Cir.1996) ("Absent certain defenses ... [plaintiff] did not have the right to elect not to perform the work. It was obligated to proceed and rely on its remedy under the standard disputes clause in the contract if it wished to claim that insistence on literal compli-

ance was unreasonable."). By pressing the issue at the time of performance of the contract, it accepted the risk that the CO would determine that database entry was required and that performance was due.

**49.** Given what appeared, understandably, as WJW's tremendous resistance to performing the EMCS tie-in under the contracts, it would seem reasonable that the government would seek a new subcontractor.

forced to add FIDs. It is apparent that the cards supplied are not fully compatible with the Government's existing EMCS system. The Government's EMCS personnel continue getting erroneous readings on return air and mixed air temperatures caused by improper location of sensors. A point-to-point calibration of the equipment was never completed.

According to plaintiff, the work on Contract 0042 was substantially complete as of August 1991; all that remained was completion of punch-list items provided by Fort Gordon in December 1991. It is clear from the documents, however, that, as late as April 1992, neither IGGC nor WJW provided the required database entry to enable the buildings to be monitored and controlled by the EMCS. At some point prior to April 10, 1992, the buildings were connected to the EMCS. The reasons given for default indicate that the buildings were running on the EMCS, despite the erroneous readings. Thus, unlike the termination for Contracts 0014 and 0018, the software requirement is not implicated in the termination of Contract 0042. The government, in a letter dated April 10, 1992, highlighted numerous, additional problems regarding the work under the contract. These problems related to two items: malfunctioning MUX cards and improper location of sensor points.

The parties never made clear during trial why the cards malfunctioned. The government contends that the reason was an incompatibility between those cards and the system. As mentioned above, the cards provided were not truly incompatible with the system.[50] Plaintiff asserts that the malfunction was the result of a power surge and because of a malfunctioning FID, which was not provided by or serviced by either IGGC or WJW. Mr. Casciola testified that a number of failures were attributable to exposure of the idle cards to the humid environment. Regardless of the reason, it is apparent that, at some point, the system was functioning in those buildings and needed merely to be debugged. In other words, the only items left to perform were punch-list items and debugging. The correspondence indicates that IGGC was diligent in pursuing a resolution to the punch-list items. Furthermore, the parties agreed that sensor-point location was governed, not by the contract, but by industry practice. The default termination of IGGC from Contract 0042 was improper because the CO did not have reason to believe that the contract would not be completed. *Cf. Melville Energy Sys., Inc. v. United States,* 33 Fed.Cl. 616, 619 (1995), *aff'd,* 81 F.3d 1093 (Fed.Cir.1996) (unperformed work was more than punch-list work, justifying termination for default).

## CONCLUSION

Pursuant to the reasoning above, the court concludes that: (1) Contract 0042 did not require the contractor to provide a DDC–Infoscan interface under section 13C1; (2) database entry was required under section 13C1 for all three contracts; (3) the requirement of separation of EMCS and local-control components was beyond the scope of the contract; (4) the Barber–Coleman I–P transducer is the equivalent of the specified Fairchild I–P transducer; (5) the DTC backplanes used by WJW did not comply with the contract requirements; (6) any equipment that would not have been necessary but for Fort Gordon's direction of separation of components is extracontractual; (7) the additional work to repair the MUX cards was unrelated to the EMCS upgrade; and (8) IGGC was properly terminated for default on Contracts 0014 and 0018 but improperly terminated for default on Contract 0042.

The court will not attempt, without further assistance from the parties, to translate these findings and conclusions on liability into damages. The court will convene a telephone status conference in approximately one month at which time the parties will report on their efforts to resolve damages without further intervention by the court.

---

**50.** Mr. Casciola testified that the problems with the cards involved corroded leads and connectors.