**McDONNELL DOUGLAS CORPORATION, Plaintiff–Appellant,**

**and**

**General Dynamics Corporation, Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant– Cross Appellant.**

Nos. 02–5034, 02–5035, 02–5046.

United States Court of Appeals, Federal Circuit.

March 17, 2003.

Caryl A. Potter, III, Sonnenschein Nath & Rosenthal, of Washington, DC, for plaintiff-appellant McDonnell Douglas Corporation. With him on the brief was Elizabeth A. Ferrell. Of counsel on the brief was

John W. Walbran, McDonnell Douglas Corporation, of St. Louis, MO.

Donald B. Verrilli, Jr., Jenner & Block, LLC, of Washington, DC, argued for plaintiff-appellant General Dynamics Corporation. With him on the brief were David A. Churchill and Thomas J. Perrelli. Of counsel on the brief were Linda L. Listrom, and Gregory S. Gallopoulos, Jenner & Block, of Chicago, IL. Of counsel was Deanne E. Maynard.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; Bryant G. Snee, Assistant Director; Patricia M. McCarthy, Senior Trial Attorney, and Lawrence N. Minch, Attorney. Of counsel on the brief were George P. Williams, Wendell A Kjos, Robert C. Manley, and Mark A. Romano, Navy Office of General Counsel, Department of the Navy, of Arlington, VA.

Richard G. Taranto, Farr & Taranto, of Washington, DC, for amicus curiae appellants National Defense Industrial Association.

Ralph C. Nash, Jr., of Washington, DC, for amicus curiae Aerospace Industries Association. Of counsel on the brief were Marcia G. Madsen and David F. Dowd, Mayer, Brown, Rowe & Maw, of Washington, DC.

Before MICHEL, CLEVENGER and LINN, Circuit Judges.

CLEVENGER, Circuit Judge.

This case arises from the government's default termination in 1991 of a contract between the United States Navy and defense contractors McDonnell Douglas Corporation and General Dynamics Corporation (the "Contractors") to develop a carrier-based stealth aircraft. The Contractors challenge the judgment of the Court of Federal Claims in favor of the government, *McDonnell Douglas Corp. v. United States*, 50 Fed. Cl. 311 (Fed.Cl. 2001) (*"McDonnell Douglas XI"*), and the government cross-appeals for the return of unliquidated progress payments. Since the trial court misunderstood our mandate and misapplied the controlling standard, we vacate its judgment and remand. However, we see no error in the trial court's determination that the unilateral schedule imposed by the government was enforceable and not waived, that the Military and State Secrets privilege precluded litigation of the Contractors' "superior knowledge" claim, and that the government's claim for progress payments was not at issue in the case.

I

A

Now in its twelfth year of litigation, this case once again returns to this court. We have previously provided in detail the facts underlying this contract dispute. *See McDonnell Douglas Corp. v. United States*, 182 F.3d 1319 (Fed.Cir.1999) (*"McDonnell Douglas X"*). Thus, we will only provide a summary of the relevant background here.

In 1988, the Navy awarded McDonnell Douglas Corporation ("MDC") and General Dynamics Corporation ("GD") a fixed-price contract with a ceiling price of $4,777,330,294 to research and develop a carrier-based "stealth" attack aircraft called the "A-12 Avenger." *Id.* at 1322. The full-scale engineering and development ("FSD") contract required the Contractors to design and build eight stealth aircraft according to a specified delivery schedule, with the first aircraft to be delivered in June 1990 and the remaining seven

aircraft to be delivered monthly through January 1991. *Id.* The contract also gave the Navy the option to purchase four production lots of aircraft, and the Navy exercised its option on the first production lot in May of 1990. *McDonnell Douglas XI,* 50 Fed. Cl. at 313.

From the outset, the Contractors encountered difficulties in performing the contract, especially in meeting the contract schedule and in keeping the aircraft weight within specifications. *McDonnell Douglas X,* 182 F.3d at 1322. In June of 1990, the Contractors informed the Navy that they could not deliver the first aircraft on time and that the cost of completing the contract would substantially exceed the ceiling price. *Id.* As a solution, the Contractors proposed to restructure the fixed-price agreement into a cost-reimbursement contract. *Id.* Despite their negotiations, the parties could not reach an agreement on the proposed contract restructuring or on a new delivery date. *Id.* So, in August of 1990, the Navy issued a unilateral schedule modification, continuing the first flight and delivery date to December 31, 1991. *Id.*

Subsequently, more problems arose concerning the FSD contract, leading the Department of Defense ("DoD") and the Navy to question the viability of the project. *Id.* at 1322–23. On December 17, 1990, Rear Admiral William Morris, the contracting officer, sent a cure notice to the Contractors, informing them of his intention to terminate the contract for default based on the Contractors' failure to timely fabricate the required parts and to meet specification requirements. *See id.* at 1323. In their response dated January 2, 1991, the Contractors conceded that they could not meet the new delivery schedule, but denied that they were in default and asserted that the new delivery schedule was invalid or unenforceable. *Id.*

As suggested cure, they again submitted a proposal to restructure the FSD agreement to a cost-reimbursement contract. *Id.* In exchange for that restructuring, the Contractors would absorb $1.5 billion in fixed loss and would waive their claims for equitable adjustment. *Id.*

After numerous meetings with DoD and Navy principals, Admiral Morris terminated the contract for default on January 7, 1991. *Id.* at 1323–24. A few weeks later, the Navy sent a letter to the Contractors demanding the return of approximately $1.35 billion in unliquidated progress payments under the terminated contract. *Id.* at 1324.

In June of 1991, the Contractors sought relief in the Court of Federal Claims under the Contract Disputes Act, 41 U.S.C. § 609(a) (2000). After protracted litigation, the trial court held that the Contractors' performance did not constitute the basis for the Navy's decision to terminate, and the court therefore converted the default termination into a termination for convenience. *McDonnell Douglas X,* 182 F.3d at 1324. On appeal, we reversed that judgment, holding that the termination was related to the Contractors' performance. *Id.* at 1326–29. We remanded the case to the trial court to determine whether the default termination was justified. *Id.* at 1329.

After a six-week trial on remand, the Court of Federal Claims ruled in favor of the Navy. *McDonnell Douglas XI,* 50 Fed. Cl. at 319. The trial court sustained the default based solely on the Contractors' failure to meet the December 1991 first flight date. *Id.* at 315–19. It declined to base its determination of justified default on the Contractors' alleged financial inability to perform the contract, anticipatory repudiation, and failure to comply with weight and other specification requirements. *Id.* at 319–24. Turning to the

Contractors' defenses, the trial court rejected their arguments that the unilateral schedule was unreasonable and therefore unenforceable, or, if enforceable then the Navy waived the unilateral schedule and first flight date of December 1991; that the contract was commercially impossible to perform; and that the Navy had to disclose its alleged superior knowledge despite the assertion of the state secrets privilege. *Id.* at 324–26. Having addressed those issues, the Court of Federal Claims entered judgment in favor of the government. *Id.* at 326.

After entry of judgment, the government moved for a favorable entry of monetary judgment ordering that the Contractors return $1.35 billion in progress payments. Because the trial court determined that the government did not submit a counterclaim and that the unliquidated damages were not an issue in the litigation, the Court of Federal Claims ruled "it was not necessary for this court to address what we consider to be a[n] understanding among the parties that was outside the focus of this case."

The Contractors appealed the trial court's judgment and challenged the trial court's construction of our mandate, determination that the unilateral schedule was enforceable and unwaived, and dismissal of their "superior knowledge" claims. The government cross-appealed for the return of the $1.35 billion in unliquidated progress payments. We have jurisdiction over this case pursuant to 28 U.S.C. § 1295(a)(3).

### B

■■■ We review issues of law *de novo*, without deference to the trial court. *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed.Cir.1998). This plenary review also applies to interpretations of our own mandate. *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382 (Fed.

Cir.1999). However, we will not disturb the trial court's factual findings, such as its evaluation of evidence of default, unless they are clearly erroneous. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 766 (Fed.Cir.1987). A factual finding is clearly erroneous when the reviewing court is left with a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### II

### A

■■■ On remand, the Court of Federal Claims sustained the default termination based solely on the Contractors' conceded inability to make the December 1991 first flight date. *McDonnell Douglas XI*, 50 Fed. Cl. at 315–19. As it explained, if it found that the first flight date was reasonable, "the Circuit's finding that the Government's decision to terminate for default was performance-related will require us to rule for defendant." *Id.* at 313. Thus, the trial court construed our mandate as having disposed of certain issues related to the merits of the default termination and as limiting its inquiry to "whether the Navy's unilateral modification establishing a new schedule for first flight was reasonable." *Id.*

The Court of Federal Claims, however, misconstrued our mandate. Although the trial court believed that we disposed of certain issues related to the Navy's justification for the default termination, a plenary review of our opinion in *McDonnell Douglas X* belies that proposition. *See Engel Indus.*, 166 F.3d at 1382 ("We review the interpretation of our own mandate de novo.").

In *McDonnell Douglas X*, we only addressed two major issues: (1) the govern-

ment's challenge to the trial court's conversion of a default termination into one for convenience; and (2) the Contractors' cross-appeal that the government was without power to terminate an incrementally-funded contract for default. *McDonnell Douglas X,* 182 F.3d at 1325–32. We did not reach the other appealed issues based on our reversal of the conversion question.

In addressing the propriety of converting the default termination, we first determined that the Court of Federal Claims misinterpreted the holding of *Schlesinger v. United States,* 182 Ct.Cl. 571, 390 F.2d 702 (1968). *McDonnell Douglas X,* 182 F.3d at 1325–26. We explained that *Schlesinger* and its progeny only barred terminations for default where there is no nexus between the default termination and the Contractors' performance under the contract. *Id.* We then ruled, based on the trial court's findings of fact, that the termination of the FSD contract for default was related to the Contractors' performance of the contract and that a remand was necessary. *Id.* at 1326–29. We concluded our review of the conversion issue by stating:

> On remand, if the government can establish that Contractors were in default, then the termination for default would be valid. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed. Cir.1987) (holding that the government bears the burden of proof with respect to the issue of whether termination for default was justified). Conversely, if the government is not able to make this showing, then the default termination was invalid and Contractors would be entitled to a suitable recovery, presumably under a termination for convenience theory.

*Id.* at 1329.

After vacating the trial court's rulings on the loss-ratio and doctrine of superior

knowledge in light of our disposition of the conversion question, *id.* at 1329–30, we addressed whether the government had the authority to terminate for default an incrementally-funded contract. *Id.* at 1330. On that issue, we determined that the government had that authority, holding "only that the contract, throughout its term, embodied a duty to make progress toward the ultimate end item." *Id.* at 1332. We finished that discussion by stating, once again:

> The question of whether Contractors satisfied their duty is of course that of breach, and must be determined by taking into account all of the relevant facts and testimony, such as Contractors' statements that they could not meet the contract specifications, the contract delivery schedule, nor complete performance at the specified contract price. *See supra* Part II.B. We leave it to the trial court to resolve these issues in the first instance.

*Id.* The conclusion section of our opinion reiterated those limited rulings and instructed the trial court to afford the parties an opportunity to litigate the legitimacy of the default termination's justification. *Id.* at 1332–33.

Our decision in *McDonnell Douglas X* did not state whether there was in fact a default. Our ruling had a limited scope, and we emphasized that point by refusing to address the merits of the government's default justification. *Id.* at 1332 ("Of course, we do not hold today that the government's default termination is justified."). Neither the text of our opinion nor its related judgment contained any indication, expressly or by intimation, that we intended to limit the default justification inquiry on remand to the reasonableness of the December 1991 delivery date. And, there is nothing in the trial court's opinion that elucidates the basis for its misinter-

pretation of our mandate. Therefore, we must conclude that the Court of Federal Claims misunderstood our mandate.

Because our decree does not require such a result, the trial court's finding that the unmet first flight date in December 1991 was reasonable is insufficient to sustain a default termination in this case. *See Lisbon*, 828 F.2d at 765 (stating that "the government did not, as it urges, satisfy its burden by merely showing that the contractor was behind schedule"). Consequently, the judgment in favor of the United States cannot stand on that sole ground.

■ Although the parties have requested that we finally dispose of this protracted litigation on appeal, the record at this point does not permit us to do so. In determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues. *See id.* at 766–67 (reviewing trial court's factual findings and decision regarding default termination for clear error). Because the Court of Federal Claims focused its ruling on the reasonableness of the December 1991 date, it did not make adequate findings on whether the Navy justifiably terminated the Contractors for default. Mindful of our limited role as a court of appeals, *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1585 (Fed.Cir.1995) (emphasizing that "we sit as a court to review claims that a trial judge erred, and not as a court of first instance"), we decline to resolve this dispute on an incomplete record. Accordingly, we have no choice but to vacate the trial court's judgment and remand for further proceedings.

### B

■ On remand, the Court of Federal Claims must address the issue that war-

ranted a remand in *McDonnell Douglas X:* "[W]hether the government's default termination was justified, an issue upon which we express or intimate no view." *McDonnell Douglas X*, 182 F.3d at 1321. However, the parties could not agree in this appeal on the proper legal standard applicable to that inquiry. Since the determination of legal standards is a pure issue of law, *see Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1312 (Fed.Cir.2002) (indicating that the choice of legal standards is a legal question), we now resolve that dispute and clarify the requirements for determining whether the government has proved that the Contractors were in default.

In this case, the government's authority to terminate the contract for default derives from the incorporated terms of FAR 52.249–9. That FAR clause provides:

> (a) (1) The Government may, subject to paragraphs (c) and (d) below, by written Notice of Default to the Contractor, terminate this contract in whole or in part if the Contractor fails to—
>
> . . .
>
> (ii) Prosecute the work so as to endanger performance of this contract (but see subparagraph (a)(2) below);

48 C.F.R. § 52.249–9 (1984). The plain language of the default provision permits termination whenever the contractor fails to "[p]rosecute the work so as to endanger performance of this contract." *Id.*

The parties advance drastically opposite interpretations of this default provision. The Contractors contend that our precedent, such as *Lisbon*, permits a default termination only upon repudiation or impossibility of performance. As they explain, "a contractor's deficiencies must therefore be so severe as to be the practical equivalent of a repudiation or aban-

donment of the entire contract effort." Because the Contractors believe that "it must be clear that the contractor cannot or will not complete performance," they submit that it is improper to default terminate a contractor merely because it is unable to meet an interim contract milestone. The government, in contrast, argues that the interpretation of this specific default provision is an issue of first impression and that the circumstances of this case are so different that we should not seek guidance from precedent. Rather, according to the government, the default provision in this contract permits termination whenever a contractor raises concerns about its ability to satisfy a contractual requirement, such as meeting a schedule or some specification requirements. Under that construction of the default clause, the government argues that default termination was appropriate here given the Contractors' admitted inability to meet an interim contract milestone, the alleged impossibility for the aircraft design to meet contract specifications, and the Contractors' request for a restructuring of the agreement.

We disagree with the parties' interpretations of the default clause in this contract. Contrary to the Contractors' position, the default provision does not require absolute impossibility of performance or a contractor's complete repudiation or abandonment. *Discount Co. v. United States,* 213 Ct.Cl. 567, 554 F.2d 435, 441 (1977) (holding that "the default clause in this contract did not require a finding that completion within the contract's time limitations was impossible"); *Universal Fiberglass Corp.*

*v. United States,* 210 Ct.Cl. 206, 537 F.2d 393, 398 (1976) (affirming default termination despite lack of express repudiation). Nor does the provision permit, as the government implies, default termination based solely on a contractor's concerns about meeting a contractual schedule milestone or specification requirements. *See Lisbon,* 828 F.2d at 765. Rather, the proper interpretation of the default provision lies somewhere between the parties' extreme positions, and should strike a balance between the judicial aversion to default terminations, *see J.D. Hedin Constr. Co. v. United States,* 187 Ct.Cl. 45, 408 F.2d 424, 431 (Ct.Cl.1969) (stating that "a default termination is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence" (citation omitted)), and the fact that "the Government, just as any other party, is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specification." *Cascade Pac. Int'l v. United States,* 773 F.2d 287, 291 (Fed.Cir.1985) (affirming finding of default termination).

■ The pragmatic approach we adopted in *Lisbon* achieves that desired balance and provides the proper interpretation of the default clause.[1] Like this case, *Lisbon* involved a default termination of a contractor for failure to prosecute with diligence, despite the fact that the contractor still had time to complete performance of the contracted project. *Lisbon,* 828 F.2d at 765–66. After determining that the government bore the burden of proof in justifying a default termination,

---

1. Although the government distances itself from *Lisbon* in this appeal, it relied on that precedent throughout the proceedings on remand. Indeed, the government urged the Court of Federal Claims to apply the *Lisbon* standard in its opening argument, during trial, in its closing statement, and in its post-trial briefs. Our jurisprudence does not con-

done such a reversal in position between trial and appeal. *See Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1345 (Fed. Cir.2001) ("The doctrine provides that a party will be judicially estopped from asserting a position on appeal that is directly opposed to a position that the party successfully urged at trial.").

*id.* at 765, we clarified that "the government did not, as it urges, satisfy its burden by merely showing that the contractor was behind schedule." *Id.* Rather, we construed the default provision to "require reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *Id.* (internal quotation marks and brackets omitted) (quoting *RFI Shield–Rooms*, ASBCA Nos. 17374, 17991, 77–2 BCA ¶ 12,714, 61,735 (Aug. 11, 1977), and citing *Discount*, 554 F.2d at 441). Since then, we have adopted that formulation as the controlling standard in default cases involving a failure to make sufficient progress.[2] *See, e.g., Danzig v. AEC Corp.*, 224 F.3d 1333, 1336–37 (Fed.Cir.2000) (indicating that the ASCBA properly applied the *Lisbon* standard in reviewing a default termination for failure to make progress). We again reaffirm in this case that the test formulated in *Lisbon* controls the determination of whether the government justifiably default terminated a contractor for failure to make progress.

■■■■ In applying that standard, we have required that the contracting officer's termination decision be based on tangible, direct evidence reflecting the impairment of timely completion. *See Lisbon*, 828 F.2d at 766 ("At trial, the government did not offer *direct* testimony or any other *direct* evidence on the time which it estimated it would take Lisbon to complete the contract."). In other words, a court's review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry. *Id.* at 766–67 (reviewing evidence underlying government's default termination). Although the contracting officer's testimony and contemporaneous documents are relevant to that determination, *id.* at 766, the trial court may also consider other factors usually relied upon by courts and contract boards, such as a comparison of the percentage of work completed and the amount of time remaining under the contract, *see, e.g., Thomas & Sons, Inc.*, ASBCA No. 51,874, 01–1 B.C.A. (CCH) ¶ 31,166 (ASBCA Nov. 13, 2000); *Nat'l Interior Contractors, Inc.*, ASBCA No. 46,089, 96–2 B.C.A. (CCH) ¶ 28,370 (1996);

**2.** This standard is accepted and applied by the contract boards and trial courts in reviewing default terminations for failure to make progress. Indeed, the Boards of Contract Appeals, whose specialized expertise with government contracts is entitled to respect, have long adopted the *Lisbon* standard in reviewing the government's default termination of contractors who allegedly failed to prosecute their work with diligence. *See, e.g., Bison Trucking & Equip. Co.*, ASBCA No. 53,390, 01–2 B.C.A. (CCH) ¶ 31,654 (2001); *Thomas & Sons, Inc.*, ASBCA No. 51,874, 01–1 B.C.A. (CCH) ¶ 31,166 (ASBCA Nov. 13, 2000); *Santee Dock Builders*, AGBCA No. 96–161–1, 99–1 B.C.A. (CCH) ¶ 30,190 (AGBCA Dec. 17, 1998); *Nat'l Interior Contractors, Inc.*, ASBCA No. 46,089, 96–2 B.C.A. (CCH) ¶ 28,370 (ASBCA May 23, 1996); *Am. Int'l Contractors, Inc./Capitol Indus. Constr. Groups, Inc.*, ASBCA No. 39,544, 95–2 B.C.A. (CCH) ¶ 27,920 (1995); *Hillebrand Constr. of Midwest, Inc.*, ASBCA No.

45,853, 95–1 B.C.A. (CCH) ¶ 27,464, (ASBCA Jan. 18, 1995); *Mich. Joint Sealing, Inc.*, ASBCA No. 41,477, 93–3 B.C.A. (CCH) ¶ 26,011 (ASBCA Apr. 26, 1993), *aff'd*, 22 F.3d 1104 (Fed.Cir.1994) (table); *Skip Kirchdorfer, Inc.*, ASBCA Nos. 32,637, 35,074, 91–1 B.C.A. (CCH) ¶ 23,380 (A.S.B.C.A. Sept.13, 1990), *aff'd*, 944 F.2d 912 (Fed.Cir.1991) (table); *B.M.S., Inc.*, ASBCA No. 35,430, 90–2 B.C.A. (CCH) ¶ 22,644 (ASBCA Jan. 26, 1990). Similarly, the Court of Federal Claims has applied the *Lisbon* standard in reviewing default terminations for failure to make progress. *See, e.g., Morganti Nat'l, Inc. v. United States*, 49 Fed. Cl. 110, 129–32 (Fed.Cl.2001) (affirming default termination), *aff'd*, 36 Fed.Appx. 452 (Fed.Cir.2002); *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 371 (Fed.Cl.1999) (reversing default); *Interstate Gen. Gov't Contractors, Inc. v. United States*, 40 Fed. Cl. 585, 606–08 (Fed.Cl.1998) (reversing default).

the contractor's failure to meet progress milestones, *see, e.g., James E. Kennedy, Tr. v. United States,* 164 Ct.Cl. 507, 512 (1964); *AAR Corp.,* ASBCA No. 16,486 et al., 74–2 B.C.A. (CCH) ¶ 10,653 (A.S.B.C.A. Apr.24, 1974); problems with subcontractors and suppliers, *see, e.g., Abcon Assocs., Inc. v. United States,* 49 Fed. Cl. 678, 686–87 (2001); the contractor's financial situation, *see, e.g., Universal Fiberglass,* 537 F.2d at 395–96, 398; as well as a contractor's performance history, *see, e.g., Decker & Co. v. West,* 76 F.3d 1573, 1581 (Fed.Cir.1996); and other pertinent circumstances surrounding the decision in order to determine whether the contracting officer had a valid basis for his conclusions. *Lisbon,* 828 F.2d at 766–67; *see also Discount,* 554 F.2d at 441 ("The record is plain, however, that the default termination was not based on this demand *per se* but rather on the over-all evidence of Discount's failure to prosecute diligently its work under the contract."); *L & H Constr. Co.,* ASBCA No. 43,833, 97–1 B.C.A. (CCH) ¶ 28,766 (ASBCA Feb. 5, 1997) ("The Government owes the contractor no less than an assessment of all the relevant circumstances when it exercises its discretion under the default clause.").

 Our precedent does not require, however, that the contracting officer be correct in his assessment, as the Contractors would have us rule. He only needs to be "justifiably insecure about the contract's timely completion." *Discount,* 554 F.2d at 441. Because the inquiry is concerned with the contracting officer's reasonable belief rather than whether he was correct, it would be impermissible "to show that after the termination action events occurred which would have permitted the contract to be completed by the delivery date." *RFI Shield–Rooms,* 77–2 B.C.A. (CCH) ¶ 12,714 (cited with approval by *Lisbon,* 828 F.2d at 765). A consider-

ation of post-termination factors and events would transform *Lisbon's* "reasonable belief" requirement into a demand that the contracting officer have perfect foresight. Limiting the inquiry to the time of the termination action reduces the potential for hindsight bias. *See RFI Shield–Rooms,* 77–2 B.C.A. (CCH) ¶ 12,-714. Thus, the trial court should focus on the events, actions, and communications leading to the default decision in ascertaining whether the contracting officer had a reasonable belief that there was no reasonable likelihood of timely completion.

To make that determination, the Court of Federal Claims will first have to decide the actual performance that the contract requires and the amount of time remaining for performance. *See Lisbon,* 828 F.2d at 766 (faulting the government for failing to provide "*direct* evidence on the time which it estimated it would take [the contractor] to complete the contract."). Unless the contracting officer had determined the entire effort required under the contract and the time left to complete the contract, it would be difficult, if not impossible, for him to resolve whether "there was no reasonable likelihood that the contractor could perform the *entire contract effort within the time remaining for contract performance.*" *Id.* at 765 (emphasis added and brackets omitted).

In this case, the parties do not agree on either of those underlying issues. They each harbor differing views of the contract completion date, ranging from the opinion that no such date existed, to the notion that the design and testing under the contract would require at least four to five years, to the suggestion that missing the first aircraft delivery date was tantamount to failing to timely complete the contract. In addition, the parties seem unsure whether the contract solely requires delivery of the eight prototype aircraft or

**1018**

whether the agreement also requires delivery of the production lot purchased by the Navy under the contract's option provisions. Given those competing claims and the incomplete record before us, we leave it to the trial court to determine on first instance the actual performance required by the contract and the amount of time remaining for that performance.

█ To summarize, on remand, once the Court of Federal Claims determines the performance required by the contract and the contract completion date, it can then decide, in light of the information upon which the contracting officer relied in deciding to terminate for default, whether the government has met its burden of proving that the contracting officer had a reasonable belief that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for performance.[3] As we explained in *McDonnell Douglas X:*

> On remand, if the government can establish that Contractors were in default, then the termination for default would be valid. Conversely, if the government is not able to make this showing, then the default termination was invalid and Contractors would be entitled to a suitable recovery, presumably under a termination for convenience theory.

*McDonnell Douglas X,* 182 F.3d at 1329 (citation omitted). Whether the government has met its burden is not an issue we reach here, since it is a determination that we yield initially to the trial court and on which we neither express nor intimate any view. *See Olson Plumbing & Heating Co.*

*v. United States,* 221 Ct.Cl. 197, 602 F.2d 950, 955 (1979) (stating that "whether the default termination is proper depends upon the facts and circumstances of each case"). Similarly, we decline to decide whether the Court of Federal Claims needs to conduct additional proceedings or admit additional evidence, as those matters are better left to the trial court's broad discretion. We merely hold and reaffirm in this case that the test we adopted in *Lisbon,* as further explained in this opinion, controls the review of default termination for failure to make progress.

### III

We now turn to the other issues raised by Contractors in this appeal. The Contractors challenge the trial court's determination that the government's unilateral schedule was enforceable and not waived. Moreover, they contend that it was reversible error to preclude them from litigating their "superior knowledge" claim based on the government's invocation of the Military and State Secrets privilege. We address each contention *seriatim.*

### A

█ After the Contractors failed to meet the June 1990 delivery date and the parties could not agree on a new bilateral schedule, the Navy unilaterally imposed a new delivery schedule through the issuance of Modification No. P00046. Because the unilateral schedule was allegedly not reasonable, the Contractors argue that the schedule is not enforceable. We disagree.

---

3. Although the parties disagreed at oral argument whether the trial court should show any deference to the contracting officer's decision, it is well-settled that the Court of Federal Claims reviews the decision to terminate a contractor for default *de novo. See Wilner v. United States,* 24 F.3d 1397, 1401 (Fed.Cir. 1994) (en banc) ("[I]n court litigation, a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision. De novo review precludes reliance upon the presumed correctness of the decision.").

 If the government elects to the government to have perfect prescience and be infallible in its decision. Because such an expectation is unachievable, the touchstone of this inquiry must remain grounded on reasonableness based on what the government knew or should have known when it adopted the unilateral schedule.

If the government elects to permit a delinquent contractor to continue performance past a due date as it did in this case by waiving the June 1990 delivery date, *McDonnell Douglas XI*, 50 Fed. Cl. at 315, the government can establish a new contract completion date, which will serve as a basis for default termination, either through a bilateral agreement with the contractor or by unilateral action. *DeVito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147, 1154–55 (1969). If the government opts to act unilaterally, the new date that it sets must be "both reasonable and specific from the standpoint of the performance capabilities of the contractor at the time the notice is given." *Id.* at 1154. The reasonableness of the action turns on what the government "knew or should have known" at the time it imposed the new schedule. *ITT Corp. v. United States*, 206 Ct.Cl. 37, 509 F.2d 541, 549–50 (1975).

Beyond this standard of reasonableness, our precedent does not impose the additional burdens that the Contractors would impose on the government when the United States unilaterally imposes a new completion date. Contrary to what GD contends, our precedent neither requires a determination of "what work remained to be completed as of the date the unilateral schedule was issued," nor does it necessitate an inquiry into "how long it likely would have taken the contractor to complete the remaining work, given its actual production capabilities as of the date the schedule was issued." Although those inquiries may be appropriate in certain situations, they are not requisite underpinnings for the *DeVito* reasonableness determination. Similarly, we reject the "objective achievability" paradigm suggested by the Contractors as not rooted in our precedent. Were we to adopt this new criterion, we would depart from our case law by requiring more than reasonableness; we would compel

Based on the information available at that time, the government's unilateral schedule was reasonable. After the parties failed to agree on a new schedule, the government proceeded to adopt a new performance schedule through a methodical inquiry. Captain Elberfeld, who prepared the schedule, conducted an independent analysis, taking into account all the issues and information then available to him. He did not solely rely on the Contractors' estimates, having lost confidence in their ability to correctly predict the schedule. Rather, he added an additional 25 percent for slippage on top of the Contractors' estimates, took into account the microcracking problems with the prototypes and the Contractors' work on resolving that issue, consulted with different qualified personnel of the Navy and the Contractors, and considered the Contractors' track-record and evidence of progress. As the trial court found, "once given his orders to develop a unilateral first flight schedule, Captain Elberfeld went about his mission in a thorough and comprehensive manner." *McDonnell XI*, 50 Fed Cl. at 318. In fact, "Captain Elberfeld set a schedule that took into account the critical information that he had at the time." *Id.* at 318–19. On that basis, the Court of Federal Claims found that the December 1991 first flight date was reasonable and enforceable. We do not see any clear error in that finding.

**B**

 Similarly, we agree with the Court of Federal Claims that the Navy

did not waive the December 1991 first flight date. For a waiver of default to occur, there must be both a "(1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent." *DeVito*, 413 F.2d at 1154. The application of this standard supports the conclusion of the trial court.

First, the facts do not substantiate the Contractors' allegations of forbearance based on the Navy's references to a date in the first quarter of 1992 as the first test flight date. The Navy mentioned that 1992 date on only two occasions, neither of which involves the necessary indicia of forbearance. The first time, when Captain Elberfeld mentioned the 1992 date during a presentation at the Tailhook Convention in September 1990, he was merely attempting to manage expectations and trying to provide an estimated date for planning purposes. The second time, when Captain Elberfeld told the Contractors at a Defense Acquisition Board meeting to assume a March 1992 first flight date, he made his statement contingent upon a restructured program that was being negotiated at that time but never materialized. The Court of Federal Claims, having heard the live testimony and having had the opportunity to assess the witnesses' credibility, found that those two situations did not amount to an intended forbearance. The record supports that finding, and the Contractors have not shown that trial court clearly erred.

Second, the Contractors failed to show any evidence of detrimental reliance on the government's alleged waiver. Although the Contractors spent over $100 million every month to perform the contract, they would have done so regardless of whether their perceived deadline was December 1991 or March 1992. The significant monthly expenditure is not evidence of a change in position based on detrimental reliance; it just indicates that the Contractors were attempting to perform their contractual duties. The Contractors have not provided evidence, to this court or the trial court, that they adjusted their work or delayed their scheduled performance based on the expectation that the delivery date was four months later than December 1991. Without such evidence, we decline to disturb the Court of Federal Claims' finding that the government did not waive the December 1991 deadline.

## C

 Finally, we see no error in the trial court's decision to reject the Contractors' claim of "superior knowledge." As we previously explained, "[i]n government contracts law, under certain circumstances the government owes a duty to disclose critical information to a contractor that is necessary to prevent the contractor from unknowingly pursuing a ruinous course of action." *McDonnell Douglas X*, 182 F.3d at 1329 (internal quotation marks omitted). Failure to disclose such critical information may result in a finding that the government breached its contractual duty. *Id.* However, the Court of Federal Claims determined in this case that the Contractors could not proceed with that defense, because the litigation of that claim would require extensive discovery into classified military information. *McDonnell Douglas XI*, 50 Fed. Cl. at 324–25. Specifically, the continued litigation may involve the disclosure of classified information regarding the B–2 and F117 stealth aircraft. Because the government has satisfied the requirements for the Military and State

Secrets privilege, we affirm the decision of the Court of Federal Claims on this point.

■■■■ The Military and State Secrets privilege allows the United States to block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security. *Crater Corp. v. Lucent Techs., Inc.,* 255 F.3d 1361, 1370 (Fed.Cir. 2001). As the Supreme Court explained,

[t]he privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect.

*United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (footnotes omitted). Courts should accord the "utmost deference" to executive assertions of privilege upon grounds of military or diplomatic secrets, and judicial review of such a claim of privilege is necessarily narrow. *See United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The court need only be satisfied that, under the particular circumstances of the case, "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Reynolds,* 345 U.S. at 10, 73 S.Ct. 528; *see also In re United States,* 872 F.2d 472, 475–76 (D.C.Cir.1989).

■■■■ Once the privilege is properly invoked by a government official with adequate authority and there is independent judicial review of the circumstances, "even the most compelling necessity cannot over-come the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds,* 345 U.S. at 11, 73 S.Ct. 528. The privilege is absolute, and "[n]o competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege." *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C.Cir.1983).

■■■■ Thus, when the "very subject matter of the action" is a state or military secret, the action must give way to the proper invocation of the state secrets privilege. *See Totten v. United States,* 92 U.S. 105, 107, 23 L.Ed. 605 (1875) ("[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated."). Although harsh, the presence of a properly invoked state secrets privilege requires dismissal of the claim that cannot prevail without the privileged information. *Reynolds,* 345 U.S. at 11 n. 26, 73 S.Ct. 528; *Zuckerbraun v. Gen. Dynamics Corp.,* 935 F.2d 544, 547–48 (2d Cir.1991) (affirming dismissal of action upon intervenor United States' proper invocation of state secrets); *Weston v. Lockheed Missiles & Space Co.,* 881 F.2d 814, 816 (9th Cir.1989) (recognizing that state secrets privilege alone can be the basis of the dismissal of a suit); *Bentzlin v. Hughes Aircraft Co.,* 833 F.Supp. 1486, 1495–97 (C.D.Cal.1993) (dismissing case based on, inter alia, state secrets privilege); *see also DTM Research, LLC v. AT & T Corp.,* 245 F.3d 327 (4th Cir.2001) (ruling that the quashing of subpoena on the United States that threatened state secrets did not foreclose possibility of fair trial and thus did not warrant dismissal). Because of its breadth and severe effect, the privilege should not be

lightly invoked and found. *Reynolds*, 345 U.S. at 8, 73 S.Ct. 528.

In this case, the two requirements for applying the state secrets doctrine were satisfied. First, the Secretary of the Air Force made the formal assertion by submitting a declaration setting forth the reasons for invoking the privilege.[4] As he explained, discovery of the information sought by the Contractors may lead to inadvertent and unauthorized disclosure of the stealth technology unavailable in other countries and may pose a grave risk to our national security. To buttress that assertion, he also submitted to the trial court, for *in camera* review, a classified declaration that provided in more detail the specific reasons why disclosure of the information sought by the Contractors would endanger our national and military interests.

Second, after review of the declarations and the circumstances surrounding the invocation of the privilege, the trial court determined that the circumstances for the assertion were appropriate. In the original trial, a series of security breaches and discovery abuses led the trial court to conclude that litigation of the superior knowledge could not proceed. *McDonnell Douglas X*, 182 F.3d at 1329. On appeal, we vacated the state secrets determination in light of the reversal of the default termination conversion. *Id.* at 1329–30. We invoked the trial court's discretion to reconsider that issue. On remand, the Contractors' renewed discovery requests again prompted the Air Force to invoke its Military and State Secrets privilege. After considering the renewed assertion of privilege and the situation surrounding it, the Court of Federal Claims found that "[n]either the passage of time nor intervening

developments have lessened the risks that prompted us to act in the first instance."

We agree with that ruling. Not only has the Secretary of the Air Force properly invoked the privilege as required by the Supreme Court, but to litigate the superior knowledge claim would require giving the Contractor's attorneys access to the classified information and ultimately divulging the information at trial. *See Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1242–44, 1242 n. 8 (4th Cir.1985) (providing that privilege requires dismissal of claim thereby preventing disclosure at trial of classified information despite the fact that one of the parties had "personal knowledge of classified matters within the scope of the state secrets privilege"). Given the history of security breaches and discovery abuses in this litigation, *McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 270, 276–78 (Fed.Cl.1996) (discussing pattern of security lapses during discovery, including inappropriate deposition questions by the Contractors' counsel that led to the disclosure of classified information and the use of classified information in open court and other unclassified documents), there is a risk that the military and state secret once divulged is unlikely to remain protected in this case. The public good must prevail over individual needs by enforcing the privilege and protecting the military secrets at issue here. *See Reynolds*, 345 U.S. at 11 n. 26, 73 S.Ct. 528. We see no reason to fault the trial court's conclusion that the government's privilege was properly invoked and that the privilege bars further adjudication of the superior knowledge claim.

 The Contractors concede that the properly invoked privilege attaches to this

---

**4.** Although this case involves the Navy, the person authorized by the President in Executive Order 12,958 to determine the proper classification of information is the Secretary of the Air Force.

proceeding. Instead, they contend that the Due Process Clause of the Fifth Amendment trumps the privilege by giving them a right to present all available defenses, including the superior knowledge defense. Relying on an application of the Due Process Clause in criminal cases, the Contractors argue that the Fifth Amendment compels the government to choose between fully disclosing classified information and proceeding with the prosecution of its claim. According to the plaintiffs, because the government refused to fully disclose the secrets, the default termination decision must be dismissed. However, in making that argument, the Contractors essentially conflate rules governing criminal and civil proceedings, elevating this civil contract dispute into the constitutional territory of a criminal prosecution. The Supreme Court has already considered the Contractors' very argument in the Military and State Secrets privilege context and rejected it:

> Respondents have cited us to those cases in the criminal field, where it has been held that the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented.

*Reynolds,* 345 U.S. at 12, 73 S.Ct. 528 (footnote omitted). The Contractors are not at jeopardy from an attack on them by the government. Rather, they are the plaintiffs in this purely civil matter, suing the sovereign on the limited terms to which it has consented. Thus, the Fifth Amendment does not require that they be able to present all defenses, including a defense that would threaten national security. Complying with the high court's edict as we must, we therefore reject the Contractors' Fifth Amendment contention.

Without a legal basis for their argument, the Contractors support their contention with practical concerns. According to the Contractors, an affirmance of the trial court's ruling on this issue would permit the government to abuse its authority as both litigant and sovereign and would lead it to use default termination as a ready alternative to terminations for convenience. For those reasons, the Contractors submit that they must have a right to either gain access to the military secrets or have the default termination vacated. We disagree. First, although the Contractors ascribe a fraudulent and deceptive intent to the government and its agents, they have not presented any evidence or corroborative facts to support their allegations. Nor have they cited any case in which the government has actually misused the Military and State Secrets privilege as they describe. Second, if we acceded to the Contractors' request and burdened the government with a duty in a civil setting to either divulge the state secrets or face an adverse disposition of the suit, we would ignore controlling precedent from the Supreme Court and authorities from other circuits that have unequivocally dismissed private claims that threatened to expose a state secret protected by the privilege. *Reynolds,* 345 U.S. at 11–12, 73 S.Ct. 528; *Zuckerbraun,* 935 F.2d at 547–48; *Weston,* 881 F.2d at 816; *Molerio v. Fed. Bureau of Investigation,* 749 F.2d 815, 825 (D.C.Cir.1984) (granting summary judgment for govern-

ment after determining that the privilege was properly invoked and applied in that case); *Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 281 (4th Cir.1980) (en banc) (affirming dismissal of a contractor's suit against a Navy employee for wrongful interference with prospective contractual relations, because the court was concerned about interrogating witnesses in open court about sensitive matters); *Bentzlin,* 833 F.Supp. at 1495–97. This well-established precedent demonstrates that, when a properly invoked claim of State Secrets privilege undercuts a civil litigant's opportunity to prove its case, the interests favoring the protection of the state secret always prevail. We see no reason to deviate from this settled law.

Because the requirements for the Military and State Secrets privilege to attach were satisfied, we affirm the trial court's refusal to permit further litigation of the Contractors' superior knowledge claims.

## IV

The government also filed a cross-appeal, claiming that the Court of Federal Claims should have entered monetary judgment in its favor for the unliquidated progress payments made to the Contractors. The trial court declined to enter judgment for the government because it did not find it necessary to address that claim.

We similarly decline to rule on this premature cross-appeal. As the government admits, "[u]ntil entry of a judgment sustaining the default, our so-called 'claim' for the unliquidated progress payments would not have been ripe." Since we vacated the trial court's judgment sustaining the default termination, the claim for a monetary judgment in the government's favor has lost its necessary predicate and is therefore not ripe for appellate review.

## V

In sum, because the Court of Federal Claims did not apply the controlling standard under *Lisbon* to this case, we vacate its ruling that the default termination was justified and remand for further proceedings consistent with this opinion. As to the Contractors' appeal of other discrete issues, we affirm the trial court's decisions on the enforceability and nonwaiver of the unilateral schedule and on the dismissal of the Contractors' "superior knowledge" claim in light of the government's proper assertion of the Military and State Secrets privilege. Finally, we decline to address or disturb the trial court's decision related to the government's claim for unliquidated progress payments.

VACATED–IN–PART, AFFIRMED–IN–PART, AND REMANDED.