**BENDER GMBH, Appellant,**

v.

**Les BROWNLEE, Acting Secretary
of the Army, Appellee.**

No. 04–1056.

United States Court of Appeals,
Federal Circuit.

July 30, 2004.

Paul D. Reinsdorf, Principal Attorney, Reinsdorf & Associates, Frankfurt am Main, Germany, Andrew George Pizor, Of Counsel Attorney, Heidelberg, GY, for Appellant.

Gerald M. Alexander, Principal Attorney, David M. Cohen, Harold D. Lester,

Jr., Of Counsel Attorney, Washington, DC, for Appellee.

Before LOURIE, GAJARSA, and PROST, Circuit Judges.

PER CURIAM.

Appellant Bender GmbH ("Bender") appeals a decision by the Armed Services Board of Contract Appeals ("the Board"), upholding the default termination of Bender's contract with the Department of Army. *Bender GmbH*, 2003 WL 21489700 (A.S.B.C.A. Jun.24, 2003). For the reasons that follow, we *affirm* the Board's decision.

## BACKGROUND

This appeal arises from a dispute between Bender and the Army concerning a contract that the Army awarded to Bender to replace and repair portions of an existing retaining wall on the Nahe River at a water supply facility near Baumholder, Germany. In the course of performance, the parties executed four modifications to the contract. Only Modifications Nos. 2 and 4 are pertinent here. In Modification No. 2, Bender sought and obtained additional money to perform drilling in class 6 and 7 soil and to extend the completion date to January 30, 1998. Bender was unable, however, to complete performance under the contract by that date. Accordingly, Bender submitted another request for equitable adjustment to account for drilling into class 7 soil on January 26, 1998. The parties eventually executed another modification (Modification No. 4) on June 25, 1998, in which the Army agreed to end a pending termination for default proceeding, give Bender a second chance to perform under the contract, and extend the contract deadline to October 9, 1998. In addition, the modification provided that the revised structural analysis ("statical") proposed by Bender would be accepted by the Army in exchange for Bender's waiver of "any and all claims or requests for equitable adjustment arising from, or connected to, alleged differing site conditions, stop work orders, and delays occurring after the effective date of the contract."

Following the execution of Modification No. 4, the Army issued two cure notices. In the first cure notice, the Army brought to Bender's attention its failure to perform certain services called for in Modification Nos. 2 and 4, including demolition of the entire toe cut-off wall. In the second cure notice, the Army warned Bender that its failure to make adequate progress to ensure completion of the project by the contract deadline may result in termination of the contract.

On October 2, 1998, the Army instructed Bender to suspend work on the foundation because it had not received any structural analysis to accomplish the foundation work specified in the specifications. The Army observed that it did not appear that the construction taking place would replace the foundation as required under the contract. Moreover, the construction undertaken by Bender would appear to narrow the width of the river, which was not approved by the German Water Authorities. Pursuant to the second cure notice, the Army terminated the contract for default on November 24, 1998. Bender timely appealed to the Board, which upheld the Army's termination decision. Bender now appeals the Board's decision. We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1295(a)(10) and the Contract Disputes Act of 1978 ("CDA") under 21 U.S.C. § 607(g)(1)(A).

## STANDARD OF REVIEW

Under the CDA, we review the Board's conclusions of law de novo. 41 U.S.C. § 609(b) (1987). Although the Board's in-

terpretations are not final and conclusive, "we give careful consideration and great respect to a board's interpretation [of contracts] because legal interpretations by tribunals having expertise are helpful even if not compelling," *Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1429 (Fed. Cir.1990). Whether or not a default by a contractor is excusable is a question of fact. *Copeland v. Veneman*, 350 F.3d 1230, 1233 (Fed.Cir.2003). Determination of facts found by the Board are "final and conclusive" unless it was arbitrary, capricious, based upon less than substantial evidence or rendered in bad faith. 41 U.S.C. § 609(b); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1577 (Fed.Cir.1994).

## DISCUSSION

### 1. Justified Default Termination

The government bears the burden of proof on the initial question of whether it was justified in terminating Bender for default. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764 (Fed.Cir.1987). Only after the justified default issue is resolved do we turn to the other claims, such as whether Bender's delay was excusable. *Id.* In this case, the contract incorporates by reference Federal Acquisitions Regulation ("FAR") clause 52.249–10, the standard language for default in a fixed-price construction. 48 C.F.R. 52.249–10. In default cases involving a contractor's alleged failure to make sufficient progress, termination may be justified if the contracting officer is "justifiably insecure about the contract's timely completion," *Discount Co. v. United States*, 213 Ct.Cl. 567, 554 F.2d 435, 441 (1977), based upon the "events, actions, and communications leading to the default decision." *McDon-nell Douglas Corp. v. United States*, 323 F.3d 1006, 1017 (Fed.Cir.2003). The default language only requires "a reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Id.* at 1016 (quoting *Lisbon*, 828 F.2d at 765).

The contracting officers testified that because of Bender's repeated delays extending over 2 years, inability or unwillingness to protect the work site from flooding damage,[1] and unwillingness to continue work on other areas of the project after the Army issued the partial suspension, they felt justifiably insecure whether Bender would complete the project by the contract deadline of October 9, 1998, or for that matter, December 31, 1998, the date to which Bender sought an extension. Bender proffers no record evidence to show it could have completed the project by the contract deadline. Indeed, in response to the Army's September 16, 1998 cure notice, which warned Bender that it may terminate the contract because Bender did not appear able to complete the project in time, Bender "rejected" the cure notice and claimed that, because of the class 7 soil in the riverbed, it *"require[d]* a construction extension up to [December 31, 1998]." Bender's admission appears consistent with evidence indicating that, after numerous months since the contract was awarded and worked commenced, more than one-third of the project remained unfinished a week before the contract deadline. We find inadequate evidence to conclude that it was unreasonable of the contracting officer to find "no reasonable likelihood that the [contractor]

---

1. Bender notes that it removed material and machines from the high water area. Such action, however, does not rebut the testimony by the contracting officers concerning Bend-er's failure to erect barriers, such as sheet piling, to prevent damage to areas likely to be affected by flooding. *Bender*, 2003 WL 21489700, Fact 31.

could perform the entire contract effort within the time remaining for contract performance." *Lisbon*, 828 F.2d at 765. Accordingly, we find the termination for default was justified.

## 2. Excusable Delay

Bender contends its delay was excusable because the Army's suspension order, even though only partial, prevented it from performing any "substantive work that could have been performed," which presumably would have enabled it to complete its work by the contract deadline. *See* 48 C.F.R. 52.249–14(a)(2) (except in instances when the failure to make adequate progress is caused by the fault or negligence of the contractor, "government acts" may serve as an excusable reason for the delay). Under appropriate circumstances, we might agree that a government's suspension of work could give rise to an excusable delay. *See DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed.Cir.1996). Because Bender bears the burden of showing that its delay was excusable in light of the suspension order, *Copeland*, 350 F.3d at 1235, it has the burden of showing that, but for the partial suspension order, it could have completed its work by the contract deadline. Bender submits no persuasive record evidence, however, to support such a position here.

■ As another apparent reason for its alleged failure to make adequate progress under the contract, Bender attempts to lay blame on the Army for not obtaining approval to narrow the river.[2] Bender ignores the contract's incorporation of FAR clause 52.236–7, which states that it is the *contractor's* responsibility to "obtain[ ] any necessary licenses and permits, and [to] comply[ ] with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work." 48 C.F.R. 52.236–7; *Bender*, 2003 WL 21489700, Fact 6. In support of its attempt to cast the blame on the Army, Bender cites the testimony of the German engineer it hired to prepare the staticals. Bender's own engineer, evidently unaware that the specification explicitly provides that the contractor is obligated to obtain approval, testified:

> In principle[,] it should be in this case the contracting office or the U.S. Government which would have to apply for . . . approval, and not the contractor. . . . *Unless the specifications specifically state that the contractor should apply for and obtain approval and permits that are necessary.*

Bender failed to meet its obligation to obtain the requisite permission from the Water Authority to narrow the river by the contract deadline. We are unpersuaded by Bender that the Board's finding in regard to whether approval was granted is unsupported by substantial evidence. *See Bender*, 2003 WL 21489700, Fact 39. In any event, even if we were to assume that Bender correctly allocated the burden on the Army for obtaining approval from the local water authority, Bender cites no record evidence to indicate it likely could have completed the project by the contract deadline had the Army timely secured the

---

**2.** In addition to contesting whether the local water authorities withheld approval to narrow the river, Bender challenges the Board's finding on whether the contracting officer "made a written inquiry to the German water agency after issuance of the partial suspension of the work and before the default termination." The Army concedes that the evidence does not support the Board's determination that the contracting officer made a written inquiry to the water authorities. Irrespective of this error, we find this does not alter our conclusion that the burden fell on Bender to obtain approval to narrow the river from the appropriate local agency and that it never obtained such permission, as required by the contract.

requisite permission from the local water authority.

 Alternatively, Bender contends that it had a right to an equitable adjustment for additional time to perform under the contract because of the class 7 soil in the excavation area. In the last modification to the contract, Bender "waive[d] any and all claims or requests for equitable adjustment arising from, or connected to, alleged differing site conditions, stop work orders, and delays occurring after the effective date of the contract." The Board interpreted the waiver to mean that Bender waived any right to equitable adjustment for the class 7 soil in the "construction area." *See Bender*, 2003 WL 21489700, Decision. Bender asserts that the modification, and hence the waiver, pertained to class 7 soil only in the drilling area, and not to "site conditions" elsewhere. As evidence, Bender references an earlier modification (Modification No. 2) that allegedly reflects an expectation that the excavation area contained no hardened rock, i.e., class 7 soil. According to Bender, "[s]ince class 7 soil was not included under item 01.08" under Modification No. 2, it "did not waive its right to claim an equitable adjustment for the extra time needed to remove the hardened rock" under the later modification.

Bender fails to grasp that the language of the later-written waiver clearly and unambiguously indicates that it applies to any "alleged differing site conditions." We find nothing persuasive within the contract to demonstrate that the term "site conditions" was restricted to a single site area, i.e., the drill site area, as Bender contends. Bender urges that no accord and satisfaction is present because the Board's interpretation does not reflect the intent of the parties. If the terms of a contract are clear and unambiguous, they must be given their plain meaning, and extrinsic evidence, such as evidence of the parties' intent is inadmissible to interpret them. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1376 (Fed.Cir.2004). We must therefore reject Bender's attempt to inject its alleged intent into how Modification No. 4 should be interpreted. We find no error in the Board's interpretation that Bender waived its right to claim an equitable adjustment for the class 7 soil found in the excavation area.

### 3. Other Board Error

Bender additionally criticizes the Board for finding that it did not comply with the description requirements of the specification and drawings. In view of the foregoing discussion, we find it unnecessary to resolve whether the Board's finding on this issue is supported by substantial evidence.

### CONCLUSION

For the foregoing reasons, we affirm the judgment by the Board upholding the default termination of Bender's contract with the Army.